**Gregory DILLON, Plaintiff,**

v.

**John BAILEY; State of Connecticut, Defendants.**

**No. CIV. 3:98CV1576 JBA.**

United States District Court, D. Connecticut.

Jan. 4, 1999.

Karen Lee Torre, New Haven, CT, for Gregory B. Dillon, plaintiff.

James W. Bergenn, Sheila Huddleston, Shipman & Goodwin, Terrance M. O'Neill, Attorney General's Office, Matthew B. Beizer, Attorney General's Office, Mac-Kenzie Hall, Hartford, for John M. Bailey, State of Connecticut, defendants.

John R. Donovan, Donovan & Morello, Cromwell, CT, for Stephen A. Kumnick, movant.

## *MEMORANDUM OF DECISION*

ARTERTON, District Judge.

Plaintiff Gregory Dillon, an Inspector with the Office of the Chief State's Attorney for the State of Connecticut since 1990, brings a First Amendment challenge under 42 U.S.C. § 1983 to the speech-limiting directives of July 30, 1996, April 28, 1997, and January 9, 1998, which were issued by defendant John Bailey, who has been Chief State's Attorney since 1993. These directives followed the plaintiff's reporting evidence that FBI agents with whom he worked on a joint task force had engaged in unlawful conduct. Plaintiff's complaint asserted two claims: interference with constitutionally protected rights and retaliation for exercise of or to chill exercise of speech rights.

### Procedural History

On October 26, 1998, the Court commenced hearing plaintiff's motion for preliminary injunction. The hearing was suspended on October 27th for efficiency reasons in favor of proceeding with a full jury trial on the merits, beginning November 16, 1998. Presentation of trial evidence lasted eight days, after which the Court charged the jury on plaintiff's First Amendment retaliation count. By special interrogatories, the jury credited Dillon's version of the events, and awarded compensatory damages of $800,000 and punitive damages of $1,500,000. The jury also found that defendant had issued an oral speech-banning directive on January 9, 1998 the existence of which defendant had denied recollection. Based in part on the jury's phase one findings, the Court thereafter ruled that Dillon's speech or desired speech was protected activity, and that the defendant had failed to carry his burden under the *Pickering* balancing showing that his directives advanced interests that overrode Dillon's First Amendment interest. Having so found, the Court then instructed the jury that defendant's directives interfered with plaintiff's rights under the First Amendment, and submitted for jury determination of non-duplicative compensatory and punitive damages, if any, proved to have been caused by defendant's interference with plaintiff's rights. The jury awarded Dillon $400,000 in compensatory damages. The following ruling amplifies the basis for the Court's trial ruling that the defendant failed to carry his burden under *Pickering* and its progeny, on which plaintiff's entitlement to damages and injunctive relief is based.

### Factual Background

Plaintiff Gregory Dillon, a law enforcement officer for 22 years, including service with municipal police and the FBI, joined the Connecticut Chief State's Attorney's office in 1990. He was subsequently promoted by defendant Bailey to head the Division of Criminal Justice's (DCJ) new fugitive squad in 1994 and became a Supervisory Inspector in 1995. He and the inspectors of the state fugitive squad became assigned to the Connecticut Fugitive Task Force ("CFTF"), a joint federal/state initiative with the mission of locating and apprehending fugitives within the State of Connecticut, and those believed to have fled Connecticut.

To apply for federal arrest warrants for these fugitives, FBI agents as a matter of practice relied on and incorporated information compiled in the form of draft affidavits by the state inspector who had conducted the investigation. The FBI agent's final affidavit was then submitted to a federal judicial officer before whom the FBI agent swore to the truthfulness of the affidavit contents, as part of the Unlawful Flight to Avoid Prosecution ("UFAP") arrest warrant application. The United States Magistrate Judge or District Judge would then assess the existence of probable cause based on the contents of the FBI agent's affidavit in deciding whether to issue a UFAP arrest warrant.

During 1996, the plaintiff and two of his inspectors participating in the CFTF, became alarmed at what appeared to be repeated instances of embellished or falsified UFAP affidavits signed under oath by the FBI agents.[1] These affidavits appeared to plaintiff and his inspectors Stephen Kumnick and Steven Freddo to contain false and fictitious information supporting the FBI agent affiant's representation that the fugitives had left the state to avoid prosecution. This information was attributed to the inspectors' investigative efforts and findings but such information had not in fact been provided to the FBI agents by them. The plaintiff discovered seven UFAP affidavits that had been submitted and sworn to before the District Court that differed in significant ways from the UFAP affidavit drafts that he and his inspectors had prepared for the agents' use, and now included factual representations attributed to the inspectors that plaintiff and his inspectors knew were untrue. Plaintiff was particularly alarmed at his discoveries in light of statements made in his presence by the Task Force's FBI coordinator to the effect that he approved and encouraged the use of unsupported embellishments or fabrications to enhance the likelihood of a judge finding probable cause, which this FBI coordinator justified on the basis that federal arrests on UFAP warrants were never prosecuted.

In spring 1998, the plaintiff alerted his immediate supervisors, Chief Inspector David Best and Deputy Chief State's Attorney Dominick Galluzzo, of his concerns of falsified UFAP affidavits. After two months, having received no response to his question on how to handle the situation, plaintiff met with Bailey, who was shocked and promised to pass the complaint on to the FBI. On July 12, 1996, the plaintiff submitted a memorandum to his superiors that set out with full documentation his precise allegations regarding the falsified affidavits. This notebook of documentation was transmitted to Bailey who in turn met with Special Agent in Charge (SAC) Merrill Parks on July 16, 1996 as confirmed by his follow-up letter to Parks expressing his certainty that "we can work out the problems which will insure that we have the best state and federal fugitive squad in the country."

On July 30, 1996, defendant Bailey issued a written directive to all Fugitive Squad members instructing them to cease any further discussion of the issue of falsified UFAP affidavits and to refrain from communications with any outside law enforcement personnel:

> Merrill Parks, Special Agent in Charge, of the FBI in Connecticut is very concerned about statements allegedly being made by members of the State of Connecticut Fugitive Squad regarding the truthfulness of certain statements in UFAP warrants to other law enforcement agencies and personnel. This issue is being addressed by Mr. Parks based on a memo prepared by Inspector Dillon and given to him by me. I do not want any further discussion of this issue with any outside law enforcement personnel or other state or federal agencies. If I do hear of any continuing discussions, I will take appropriate action.

This absolute ban on all discussion on this matter was not limited in any way and by its terms ("any further discussion of this issue") precluded plaintiff from reporting the alleged illegalities to any law enforcement agency. This directive made no reference to the Chief State's Attorney's media policy,[2] which prohibited disclosure of information relating to pending investigations. Notably, defendant's directive did not by its terms refer to, nor could it have

---

1. Plaintiff had encountered the first instance in 1994, took no action but committed himself to take action if there were any further occurrences.

2. As of July 1996, when Bailey issued the first of the directives, few in the Chief State's Attorneys office apparently had knowledge of the existence or contents of any formal media policy.

referred to, any pending FBI criminal investigation since neither the defendant nor the plaintiff knew of any at that time, and indeed, one could not have begun until at least August when Mr. Parks completed his record submission for the investigation. As evidenced by Mr. Bailey's own words, the scope and purpose was a blanket response to Mr. Parks' fury that the inspectors' allegations of FBI agent misconduct was being discussed, without any attempt at balancing or tailoring the scope of the speech ban. This reactive purpose appears confirmed the following month by Bailey's commencement of an internal inquiry through Chief Inspector Best immediately following another blast from Parks about Connecticut fugitive squad inspectors discussing at a national fugitive inspectors' conference in Texas why they left the CFTF.

On April 28, 1997 in response to a *Herald Press* article by C. Bryson Hull about the allegations, their handling, ensuing events, and interagency feuding, defendant Bailey promulgated another written directive stating:

I am attaching a memo distributed to all of you on July 30, 1996, which is self-explanatory. I am hereby reiterating that memo, but will emphasize the following directive once again: No member of the Fugitive Squad is to make *any public statement regarding the official business* of the Division of Criminal Justice. Disclosures are to be made only under the media policy of this office.

(emphasis added). The referenced media policy provides in part:

[T]he following rules are applicable to all personnel in this Office:

1. *As to Policy Statements*

The only persons authorized to make policy statements to the media are the Chief State's Attorney and the Deputy Chief State's Attorney for Finance, Personnel and Administration.

. . . . .

4. *As to Pending Cases*

No employee of this Office will make comments to the media concerning a pending case.

The defendant gave no limiting or clarifying instructions about this directive, and only explained to the inspectors that the *Herald Press* article was embarrassing to the DCJ and would affect his relations with the FBI and federal funding. In the context of the atmosphere of the Chief State's Attorney's Office, and the not coincidental timing of the directive on the heels of the *Herald Press* article, it was clear to the inspectors that this directive, in combination with the first, extended to all discussion with the media relating to the circumstances surrounding their belief of FBI wrongdoing. In fact, defendant's mid-litigation November 6, 1998 memorandum rescinding the two written directives describes those directives as having restricted "comment on the allegations of FBI misconduct," although Bailey testified at trial that "the official business of the Division of Criminal Justice," to which the second directive and media policy make reference meant the investigation and prosecution by the DCJ of criminal activity in Connecticut. No explanation was offered of a nexus between the media policy purpose and the *FBI's* investigation of the alleged unlawful conduct of FBI agents, which defendant Bailey conceded would exceed the jurisdiction of the Chief State's Attorney's office's "official business."

As a result of the directives of defendant Bailey, the plaintiff testified that he felt prohibited from speaking about any aspect of the matter in any context including responding to publicly reported misinformation, rebutting media statements by defendant impugning his or inspectors' professional integrity and reputation, or accomplishing his original objective of reporting the unlawful conduct for appropriate investigation.

The third directive, which the jury found the defendant had issued in January 1998, was in response to a telephone call to the defendant from a reporter for the *Journal*

*Inquirer,* requesting information about claimed FBI perjury and Bailey's recent disbanding of his own fugitive squad that plaintiff had supervised. Bailey had mandated an immediate meeting of his inspectors, at which he referenced the *Journal Inquirer's* interest in the matter, and was "visibly angered and upset," according to the plaintiff. The jury found by special interrogatory that at this meeting Bailey delivered an oral directive to the inspectors in attendance that if any of them wished to express a personal opinion to a reporter, defendant Bailey had no problem so long as that inspector was willing to resign first. No explanation or limitation on this directive was given. The defendant's memorandum of November 6, 1998 withdrew only the two written directives, purportedly because defendant had only just "learned that in January of this year the U.S. Department of Justice Office of Personal Integrity completed its criminal investigation" into the allegations. This recision, prepared by defendant's counsel, responded to FBI written confirmations after litigation commenced of information defendant previously had been aware of but that had prompted no earlier action.[3]

### Conclusions of Law

 While individuals do not relinquish their First Amendment rights by accepting employment with the government, it is well-established that a public employee's freedom of speech is not absolute. *See, e.g., Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (former assistant district attorney's First Amendment rights not violated where she was fired for distributing questionnaires critical of her superiors). In evaluating the validity of a restraint on public employee speech, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in

promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (dismissal of high school teacher for criticism of allocation of school funds violated First Amendment). In order to receive protection under the First Amendment, a public employee must establish, as an initial matter, that his or her speech may be "fairly characterized as constituting speech on a matter of public concern." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. "The government does not have to justify in court every disciplinary action taken in response to an employee's private speech regarding personal matters, such as a change in duties." *Harman v. City of New York,* 140 F.3d 111, 117 (2d Cir.1998) (citing *Connick,* 461 U.S. at 147, 103 S.Ct. 1684). Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *See Connick,* 461 U.S. at 147, 103 S.Ct. 1684. The parties do not dispute that speech related to allegations of FBI falsifications in sworn warrant applications constitutes a matter of public concern. Defendant Bailey agreed that it was important for the public to know about how allegations against people holding public trust were being handled.

 "Even if an employee meets these burdens [of showing that the speech was a matter of public concern], the government employer may nonetheless escape liability" if the government can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech. *Heil v. Santoro,* 147 F.3d 103, 109 (2d Cir.1998) (citing *Waters v. Churchill,* 511 U.S. 661, 673, 678, 681, 114 S.Ct. 1878, 128 L.Ed.2d 686

---

**3.** Defendant claims that his recision of these directives moots the claim for injunctive relief. The Court will reserve judgment on this

issue until after it has heard the parties on what permanent relief, if any, should be ordered.

(1994)). While substantial weight may be accorded to the government's prediction of disruptiveness, that prediction must nonetheless be reasonable. "[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished." *Jeffries v. Harleston,* 52 F.3d 9, 12 (2d Cir.1995). The Second Circuit has observed that in applying the *Pickering* test, distinguishing between facial and as-applied constitutional challenges becomes unimportant. *See Harman v. City of New York,* 140 F.3d 111, 118 (2d Cir.1998).

In conducting this balancing test, the Court observes that the degree to which the fact-finding aspect of this balancing is reserved to the jury is less than clear. The Second Circuit has commented that:

> We note in passing that [the defendants] have consistently treated the balancing issue here as turning solely on questions of law, not on any question of fact.... We can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the *Pickering* balancing test.

*Vasbinder,* 926 F.2d at 1340. In *Vasbinder,* however, the Circuit went on to explain that such a question was not implicated by the facts of that case, and thus declined to more distinctly contour the boundaries of the jury's fact-finding province.

Here, the defendant has asserted that he reasonably believed that his directives banning all discussion of the FBI misconduct issue were necessary to prevent potential material disruption of four interests or activities of his agency. First, the defendant contends that the directives were needed to protect the integrity of the ongoing internal FBI criminal investigation of the allegedly falsified affidavits. Second, he asserts he was trying to prevent violation of the restrictions imposed by Rules of Professional Conduct 3.6 and 3.8(5) on extra-judicial statements by prosecutors about the guilt or innocence of suspects, here, the accused FBI agents. Third, he sought to protect the confidence and trust of the FBI and other law enforcement agencies in the Chief State's Attorney's Office. Lastly, he claims to have been seeking to protect the confidence and trust of the general public in the Chief State's Attorney's Office.

The Court must weigh the evidence of whether and how these interests were potentially compromised by plaintiff's intended speech on this matter and whether plaintiff's speaking or intended speech was such that potential or actual disruption could outweigh the value of the protected speech. There are five areas of plaintiff's intended speech that the Court finds to have been silenced by defendant's directives: 1) discussion of the circumstances surrounding his findings of untruthful statements in FBI agents' UFAP warrant affidavits as precipitating his withdrawing from the CFTF, 2) reporting of the allegations of unlawfulness to outside law enforcement agencies or personnel, 3) discussion of his views and concerns regarding internal and external response to the matter, 4) discussion of his concerns with fellow law enforcement officers, and 5) discussion of his view of the relationship of the disbanding of the state fugitive squad and this matter.

■ After consideration of all the trial evidence, and the facts as the jury found them, the Court concludes that defendant failed to credibly demonstrate reasonable or actual potential compromise of *his* agency's interests, activities or operations to any degree or extent that outweighs the paramount importance to the public of the type of speech at issue, namely disclosure and handling of allegations of serious misconduct by law enforcement officers compromising the integrity of the judicial system itself.

Under the *Pickering* balancing approach, the burden is on the public employer to show that its interests in the efficient performance of its duties outweigh the employee's speech interest. It has been conceded by the defendant that the nature of speech at issue is a matter of public concern. Moreover, "An employee's charge of *unlawful* conduct ... is given far greater weight in the balancing exercise than is a complaint as to the fairness of internal operations." *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir.1991) (emphasis added) (citing *Connick*, 461 U.S. at 150–54, 103 S.Ct. 1684). *See also Rookard v. Health and Hospitals Corp.*, 710 F.2d 41, 46 (2d Cir.1983) (complaint of fraudulent and corrupt practices carries great weight); *Cahill v. O'Donnell*, 7 F.Supp.2d 341, 349 (S.D.N.Y.1998)("The possibility of widespread police corruption as alleged in this case is a matter of political and social concern to the community."). In *Vasbinder*, the Second Circuit explained that speech concerning the corrupt practices of public employees "were matters of serious public concern." 926 F.2d at 1340.

Plaintiff's speech interests also included carrying out his legal obligation as a law enforcement officer to report or otherwise attempt to stop unlawfulness coming to his attention, protecting the credibility and reputation for integrity of himself and other law enforcement officers and his employer the DCJ, and minimizing involved law enforcement officers' civil liability as knowing but non-responsive participants in false affidavit submissions. The matter about which the plaintiff reported, spoke or wished to speak to others and would have answered media questions about was not a minor form of public corruption, but about corruption that goes to the very heart of the integrity of the criminal justice system. The directives banned speech about a belief that purposeful misrepresentations were being made under oath to judicial officers for the purpose of obtaining issuance of arrest warrants that might otherwise not have been issued. The Court can think of few other acts that have

more potential to undermine the credibility and legitimacy of the agency for which both plaintiff and defendant Bailey work, or the federal agency with which they collaborated in the CFTF. Moreover, without disclosures by law enforcement insiders such as Dillon, willing to report their well-founded beliefs of the existence of wrongdoing by fellow law enforcement officers, such corruption is most difficult to detect, prove or prevent. As such, the Court accords this speech extremely high value in conducting the balancing test, the restraint of which is to be justified only by proof that serious, pressing needs of the employer public agency are or will be seriously compromised or threatened. *See Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686; *cf. Snepp v. United States*, 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980).

The concerns advanced by the defendant in this case, while legitimate generalized concerns for the Division of Criminal Justice, have not been proven to have had a nexus to or been significantly potentially or actually compromised so as to justify the total ban on plaintiff's speech. Plaintiff does not challenge the constitutionality of the portion of defendant's media policy that precludes employees' discussion about investigations conducted by the Chief State's Attorney's office by its employees. However, inasmuch as the only investigation conceivably at issue was the FBI's internal investigation and not one conducted by the Chief State's Attorney's Office, this objective of the defendant's own media policy has not been shown to be an applicable justification for the prior restraint on speech contained in defendant's directives. By its terms, the media policy applied only to policy statements, arrest statements, and on-going investigations by the DCJ and to its pending and disposed cases. In contrast, the on-going investigation at issue in this instance was being conducted outside the DCJ, by another law enforcement agency, and thus would not fall into any of the enumerated categories of

speech regulated by the media policy. To the extent that the directives issued by defendant Bailey intended to implement this media policy, those directives exceeded the scope of the media policy and were a misapplication of it for the reasons articulated below. Moreover, since the views of the defendant that were quoted in the newspaper articles were not expressions of DCJ "policy," but of defendant's own observations and perceptions, the media policy's limitation of who may make official policy statements is similarly not implicated by the facts of this case. Thus, because the media policy was inapplicable to the circumstances at issue in this case, the Court considers only the constitutionality of the directives issued by defendant Bailey himself, apart from the media policy.[4]

As to the protection of the integrity of the ongoing FBI investigations of the agents (and defendant's espoused purpose of protecting the presumed innocence of the implicated FBI agents), the evidence has not shown how the nature of plaintiff's speech or intended speech could have materially interfered with this investigation such that the total speech ban was required. Because Dillon had no role other than as witness in this investigation, he had no access to any confidential knowledge concerning the FBI's investigation, other than its existence, which he learned of only in December 1996 when he was interviewed FBI Office of Professional responsibility personnel. Inasmuch as plaintiff was not shown to have had any knowledge of the scope, methodology, witnesses, informants, strategy, or findings of this investigation other than the basis of his own allegations that were the subject of the investigation, defendant fails to show how the investigation could have been put at risk by Dillon's speech.

Defendant Bailey also testified as to his concern for the safety of confidential informants, but the only confidential informant whose name was in any way implicated

was one contained in one of the challenged FBI UFAP warrant applications for an at-large fugitive. However, this item of information was wholly tangential to plaintiff's allegations about why he and his colleagues left the CFTF, his belief in the seriousness of the matter and his view of the reasons his highly successful Fugitive Squad (as distinguished from the CFTF) was subsequently disbanded by the defendant. Thus it is speculative to conclude that plaintiff's speech or intended speech necessarily implicated disclosure of this tangential confidential informant's identity, particularly in light of the undisputed reputation of the plaintiff for high professional standards and integrity.

Further, defendant's position that the directives were necessary to protect the integrity of this other agency's investigation was undermined by the evidence that one of the State's Attorney's Office inspectors had given several interviews to the *Hartford Courant* during his own investigation in a high profile murder investigation, but which public statement had elicited no invocation of any media policy and produced no directives, criticism, or speech restrictions. Specifically, Inspector Frank Garr testified that he has spoken to the press regarding evidence and suspects in the as-yet unsolved murder of Martha Moxley without official remonstration. Moreover, defendant Bailey himself chose to make public comment on his views about the CFTF/FBI controversy, minimizing the significance and validity of plaintiff's allegations by referring to the conflict as "personnel problems" and "a misunderstanding," and commenting that "I would not have kept an inspector there if I had felt that there was a problem with the affidavits." Indeed, such statements by the Chief State's Attorney could well have had the unintended effect of compromising the investigation by casting doubt on the nature or gravity of the wrong alleged, and thus tacitly discouraging in-

---

4. The Court notes that, in fact, the first directive issued by Bailey (before the FBI investigation commenced) makes no reference to the media policy.

tensive and exhaustive investigative efforts. The Court concludes that the defendant has not shown that his speech ban directives were needed to protect the integrity of any ongoing investigation, nor that they in any way balanced what his media policy recognizes as the public's "right to know in criminal cases."

The defendant further posits that the ban was necessary to uphold the mandate of the Rules of Professional Conduct that prosecutors decline comment on the guilt of accused individuals, in this case, the FBI agents. However, defendant's ban could not impact speech by the federal investigative or prosecutorial staff, but instead was applied to speech of the actual accusers, Dillon and his investigators. In seeking to discuss or comment on the matter of FBI falsification, Dillon was not acting in the ordinary scope of his duties as a supervisory investigator, but instead as the complaining witness reporting the evidence to be investigated. Thus, Dillon was not acting in a capacity that implicated the ethical responsibilities or obligations of those investigating or prosecuting criminal activity or charges whose publicly expressed views could potentially compromise defendants' fair trial rights.

The defendant has also asserted that the policy and directives were necessary to protect the confidence and trust of other law enforcement agencies and the public in the Chief State's Attorney's Office. The only evidence of another agency's trust or confidence at risk in this case was that of the FBI.[5] Specifically, the defendant introduced the testimony of FBI SAC Parks that he would withdraw FBI participation from any joint operation unless Bailey could ensure that his inspectors would comply with the Department of Justice (DOJ) media policy. While the continuation of joint operations with the FBI is a

legitimate interest of the defendant, Parks conceded during his testimony that there was nothing in the DOJ media policy or the Memorandum of Understanding between the FBI and state agencies that applied the DOJ media policy to victims of crimes or accusers. Parks also conceded that he knew of no Connecticut operations that had been affected by plaintiff's speech, and knew of no FBI agents working with state agencies who now refused to work with state employees because of Dillon's allegations. Mr. Parks further acknowledged that any person having anything to do with lying to a federal judge would be in potential legal jeopardy. Further, inasmuch as Bailey never referenced compliance with the DOJ media policy in his directives or in his testimony, this post hoc justification for defendant's directives hardly seems credible under these circumstances.

On the other hand, given the nature of the speech at issue, it is more reasonable to conclude that the confidence of the public and other law enforcement agencies would instead be bolstered by discussion and timely acknowledgment of and response to plaintiff's allegations. Stifling public disclosure of plaintiff's allegations of FBI agent misconduct had much greater potential to undermine the goals of confidence and trust in the Chief State's Attorney's office, particularly where otherwise there existed an appearance that defendant was responding to the FBI's exercise of political muscle, and not acting out of reasonable necessity. Protection by the DCJ of its employees' public speech on good faith allegations of unscrupulous, unlawful or corrupt practices ultimately promotes the confidence of both the public and other law enforcement agencies in the DCJ as an agency whose integrity cannot

---

5. The Court precluded testimony by Acting Commissioner of Public Safety Henry Lee as either irrelevant or having minimal probative value outweighed by Fed.R.Evid. 403 considerations of unnecessarily prolonging trial or diverting jury focus, and because Dr. Lee was not disclosed as an expert, had no relevant testimony as a fact witness since he was not in his current position during the events at issue, and because no portion of defendant's testimony implicated major involvement of the State Police in these circumstances.

be compromised by political pressures or short term public embarrassment.

Importantly, as to all of Bailey's rationales for issuing the directives, even assuming that they were actually the legitimate concerns motivating the speech bans in this case, the defendant has not shown that his concerns could not have been handled through less restrictive means than suppression of all speech on the subject. The Second Circuit explained in *Harman* that although the government has, for example, an interest in maintaining confidential information, "[t]he agency is … free to provide notice to employees by making specific rules or providing examples of the kinds of remarks that might subject an employee to discipline. However, a blanket approval process suppresses substantially more speech than is necessary to accomplish this aim." *Harman*, 140 F.3d at 124. Similarly, Bailey's purported interests in maintaining the integrity of the internal FBI investigation, preventing violation of the Rules of Professional Conduct, or maintaining trust and confidence in his office, all could have been specifically addressed by particular guidelines more precisely contoured to his concerns. Subjected to even more restriction than the prior approval process of *Harman*, however, plaintiff's speech was simply outright prohibited.

The unwarranted breadth of these directives is illustrated by Bailey's testimony that he personally was unsure as to the scope of his directives, thus undermining any claim that a ban of this magnitude was necessary. He conceded that the language of the July 30, 1996 directive precluded speech with other agencies, such as the Department of Justice, but explained that he had not meant for such speech to be covered. As to the April 28, 1997 directive, Bailey explained that his direction to his employees not to speak about the "official business" of the DCJ meant only its investigation and prosecution of crimes. Such explanation however, provides no clarification as to why an employee could not comment on an investigation into FBI misconduct, which was acknowledged to be beyond the jurisdiction of the defendant's agency, and thus not within his own definition of "official business." The need for a ban on expression of all personal opinion to the media while an employee of the Chief State's Attorney's Office was pointedly belied by defendant's own press comments.

Finally, none of the defendant's evidence showed how any agency interest was or would be compromised by Dillon's speaking to other law enforcement officers to warn them of the potential risk of collaboration with these FBI officers, nor could Parks offer any explanation of how talking to fellow officers could compromise the pending investigation. The defendant simply did not prove that the legitimate mutual trust required and expected among law enforcement officers and agencies, which defendant claims was at risk of being impaired by further discussion, could ever be advanced by concealing unlawfulness of any one of them. Defendant's evidence offers no explanation of significant harm to be avoided by preventing Dillon from publicly commenting on the disbanding of the Fugitive Squad, despite Bailey's oral directive that inspectors' speech to the press first required relinquishment of their public employment. In fact, in direct contradiction to the substance of the written and oral directives, the defendant stated at trial that under his directives plaintiff could publicly discuss the reasons for and wisdom of disbanding the fugitive squad, could characterize defendant's action as appeasement of the FBI and could say that he was *alleging* that FBI lied (although not that they *did* lie).

In these unusual circumstances of state law enforcement officers accusing those in a federal agency of misconduct, the defendant misapplied his media policy designed to apply only to his own prosecutors and investigators and their work on criminal matters assigned to them. While the generally-accepted principle contained in the

media policy, that law enforcement officers and prosecutors should not comment on the confidential details of their investigations is not challenged by the plaintiff or addressed by this ruling, (*see also*, Rules of Professional Conduct, Rules 3.6, 3.8), the defendant has not met his burden of showing that the directives in place in this case, restraining plaintiff's speech without effort to identify the types or circumstances of speech that needed to be limited, were reasonably necessary to protect the agency's legitimate interests.

The evidence shows that Bailey overreacted to Parks' displeasure and embarrassment by instituting an overbroad policy, which encompassed substantially more speech in its scope than was necessary to achieve the ends he claimed to have sought. The first directive issued by Bailey prohibited all discussion in any form. Notably, it prohibits this discussion with law enforcement personnel, not the media, thus undercutting the defendant's assertions that this directive sought to prevent leaks of sensitive information to the media. Bailey's prohibition on speech patently overshot any of his articulated goals of protecting the efficiency of the office:

> I do not want *any* further discussion of *this issue* with any outside law enforcement personnel or other state or federal agencies.... I will take appropriate action.

(emphasis added). While Bailey testified that he did not mean for the directive to preclude the plaintiff from speaking to the Criminal Justice Commission, the Department of Justice or the United States Attorney General, Bailey's own words in the directive belie this intent on their face. Even in the law enforcement context, the July directive's total ban without any narrowed relationship to a legitimate interest is an unconstitutional interference with and chilling of plaintiff's exercise of free-

dom of speech since the defendant has not met his burden of showing that such an edict was needed.

The second, April 28, 1997 directive, undoubtedly prompted by FBI SAC Parks' potential ire, stated that:

> No member of the Fugitive Squad is to make *any public statement regarding the official business* of the Division of Criminal Justice. Disclosures are to be made only under the media policy of this office.[6]

Again, it was directed only to Fugitive Squad members and references the media policy as regulating the Fugitive Squad members' public statements "regarding the official business of the Division of Criminal Justice." While the evidence at trial made clear that the media policy was largely unused or unknown even to top officials of the Chief State's Attorneys office and had not previously been enforced, it was, by its own terms, inapplicable to the FBI affidavit falsification issue. The media policy references "investigation[s] by any Unit of this Office," arrest warrants, the "rights of the individual accused of a crime," "the right of the public to know in criminal cases," "pending cases" and "disposed cases." As defendant Bailey confirmed, the "official business" about which policy statements to the media are only to be made by the Chief State's Attorney's office and the Deputy Chief State's Attorney for Finance, Personnel and Administration, is the state's investigation and prosecution of state crimes.

Yet issuing the directive only to the Fugitive Squad members in the wake of the April 27, 1997 *Herald Press* article quoting Inspector Kumnick on his own behalf about the FBI falsification allegations, the promotion of one of the FBI agents in issue, and his inability to find out what the FBI was doing to investigate,

---

**6.** That this directive was at least in partial response to Parks' anticipated anger is evidenced by Bailey's May 2, 1997 letter to Parks, in which he personally apologized for the April 27, 1997 *New Britain Herald* article,

and indicated that he has "initiated an internal investigation on this matter and I am guarantying to you that there will not be any comments from this agency in the future." (Pl.'s Ex. 43).

defendant's directive overreached since the disclosures were about another agency's "official business."

Moreover, defendant's espoused purpose of preventing comment to the media about a pending investigation, albeit a federal agency's, was undercut by Bailey's own extensive press comment in which his views about the allegations and circumstances were extensively quoted to the exclusion of plaintiff's response or rebuttal. The Court concludes that defendant's misapplication or selective application of the media policy was to silence views contrary to his, thus depriving the public of the benefit of the marketplace of ideas.[7]

Lastly, defendant Bailey's oral directive of January 1998 following the *Journal Inquirer* article by Rhonda Stearly, totally lacked proof of necessity for such breadth, particularly inasmuch as defendant denied actually having issued such a directive.

While a law enforcement agency may indeed have legitimate reasons for setting limits on who is authorized to speak for the agency or the circumstances under which personal views could not be conveyed to the media, in the absence of defendant having met his burden of showing that the speech restraints he imposed were necessary or reasonable in this case, the blanket prohibitions at issue were clearly unwarranted. To outweigh the constitutional protection accorded to the speech of a law enforcement whistle blower, the public employer's evidence must persuasively demonstrate a reasonable belief that serious and grievous potential harm will result to its law enforcement agency's operations. Defendant's proof falls substantially short. In this context, the nature of the speech not only addressed a matter of serious public concern, but also served a public benefit by giving reassurance of the integrity of law enforcement generally, deter-

ring future unlawfulness by breaking a perceived code of silence and warning other law enforcement officials about areas of potentially injurious untrustworthiness. Accordingly, the Court finds that under the circumstances under which the defendant's prior restraint directives were issued, defendant has not shown by credible evidence that he reasonably believed that all speech on the matter would potentially interfere with or disrupt his agency's activities in any substantial way that sufficiently outweighs the significant First Amendment value of the banned speech.

### Conclusion

For the foregoing reasons, defendant did not meet his burden of proof of showing that his media directives were necessary to prevent disruption or potential disruption to the Office of the Chief State's Attorney, and accordingly those directives are declared to be unconstitutional. The plaintiff is thus entitled to consideration of damages and permanent injunctive relief.

**IT IS SO ORDERED.**

---

**7.** Interestingly, the only possible dereliction of duty, suspected release of internal office memoranda and sealed arrest warrant documents by another inspector, was never even mentioned in any of Bailey's directives (although it was a focus of his internal investiga-

tion of Kumnick's conduct), further emphasizing the real intent as being that of quashing public dissemination of embarrassing allegations about another law enforcement agency's activities and about defendant's responsive conduct.