06-2501-cv
Dillon v. Morano

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 31, 2007)                    Decided: August 16, 2007)

Docket No. 06-2501-cv

_____

GREGORY DILLON,

Plaintiff-Appellant,

v.

CHRISTOPHER MORANO,

Defendant-Appellee.

_____

Before: STRAUB AND POOLER, Circuit Judges, and VITALIANO, District Judge.[*]

_____

Appeal from the United States District Court for the District of Connecticut (Covello, J.)

dismissing plaintiff-appellant Gregory Dillon's First Amendment retaliation action.

AFFIRMED in part, VACATED in part, and REMANDED.

_____

[*]The Honorable Eric N. Vitaliano, United States District Judge for the Eastern District of
New York, sitting by designation.

KAREN LEE TORRE, Law Office of Karen Lee Torre, New Haven, CT, for Appellant.

ALBERT ZAKARIAN (Robert C. McNamee, Douglas W. Bartinik, on the brief), Day Pitney LLP, Hartford, CT, for Appellee.

_____

POOLER, Circuit Judge:

Plaintiff-appellant Gregory Dillon appeals from the May 1, 2006, judgment of the United States District Court for the District of Connecticut (Covello, J.) granting summary judgment in favor of defendant-appellee Christopher Morano on Dillon's claim that Morano allegedly engaged in a series of adverse employment actions against Dillon as retaliation for Dillon's prior protected First Amendment activity. We vacate the judgment of the district court with respect to Dillon's claim that he was denied a promotion as retaliation for his First Amendment activity, and remand this part of Dillon's complaint for further proceedings. We affirm the remainder of the district court's decision.

## BACKGROUND

Gregory Dillon is the Supervisory Inspector for the Workers' Compensation Fraud Control Bureau in the Office of the Chief State's Attorney ("OCSA") for the State of Connecticut. Dillon, after working several years as a police officer and a special agent with the FBI, was hired by the OCSA in 1990. Dillon began his career in the OCSA as an inspector in the Economic Crime Unit, where he participated in two successful and high-profile corruption investigations. In 1994, then-Chief State's Attorney John Bailey assigned Dillon to create a new unit called the Fugitive Unit. Bailey promoted Dillon to the position of Supervisory Inspector of that unit in 1995. Dillon continued to receive excellent performance reviews and numerous

2

letters of commendation for his work. In 1996, Dillon brought to Bailey's attention his belief that several FBI agents, who worked with Dillon in the Connecticut Fugitive Task Force, were submitting warrant applications containing false information to federal judges. Dillon reported the misconduct to Bailey. After this report, Bailey allegedly engaged in a series of adverse employment actions against Dillon. During this time, defendant-appellee Christopher Morano was the Deputy Chief State's Attorney.

On August 6, 1998, Dillon filed suit against Bailey in the District of Connecticut alleging that Bailey's actions were taken in retaliation against Dillon for engaging in protected First Amendment activity. One of the primary adverse actions that Bailey had allegedly taken against Dillon was his refusal to hire Dillon for the vacant position of Supervisory Inspector of the Statewide Prosecution Bureau. Bailey instead awarded this position to Charles Coffey, who at the time was an inspector in the Statewide Prosecution Bureau. Morano testified as a defense witness in the Dillon v. Bailey lawsuit. Among other things, Morano testified that Bailey was not involved in the decision to award the Statewide Prosecution Bureau position to Coffey, and attempted to explain the rationale behind the decision to hire Coffey over Dillon. Morano testified that he awarded the position to Coffey because he "felt it was important to promote from within to bolster the morale so that the people who had been there during the dark days would feel that there is some light at the end of the tunnel and it was worth sticking around. That was the basis and the thinking that I had in selecting Mr. Coffey." Morano gave similar testimony at his deposition in the Dillon v. Bailey case: "[Coffey] had also worked in state wide prosecution longer and understood the operations of that particular bureau; and often it is better, and I felt in this particular situation it was better, to promote from within, someone who knew and had done

3

their time there."

On November 25, 1998, the jury returned a verdict against Bailey on all counts.  By special interrogatory, the jury specifically found that Bailey had acted with retaliatory motive in denying Dillon the position in the Statewide Prosecution Bureau.  The jury awarded Dillon compensatory damages of $800,000 and punitive damages in the amount of $1.5 million as well as an additional $400,000 in compensatory damages with regard to Dillon's separate claim regarding a gag order Bailey had put in place.  See Dillon v. Bailey, 45 F. Supp. 2d 167, 169 (D. Conn. 1999).  Dillon and Bailey agreed to settle the matter for $1.5 million.

On February 19, 1999, Dillon became Supervisory Inspector of the Gang & Continuing Criminal Activity Bureau ("GCCAB") in the OCSA, where he was involved in a corruption investigation case that garnered wide-spread media attention and ended with the successful prosecution of the suspects.  Dillon continued to receive excellent performance reviews and community recognition for his work.

In December 2002, Bailey retired from the OCSA and Morano was appointed the new Chief State's Attorney.  Dillon alleges that Morano engaged in a series of adverse employment actions against him as retaliation for pursuing his claims against Bailey.  Specifically, Dillon alleges the following: (1) Morano interfered with his 1997 performance evaluation by requesting Dillon's supervisor to make changes to the positive comments in the evaluation and then refusing to sign the evaluation; (2) Morano stripped the GCCAB, Dillon's unit, of essential personnel and resources necessary to conduct their work even though the number of cases handled by the GCCAB continued to grow during this time; (3) Morano relocated the GCCAB unit to a different building and assigned Dillon to a cramped windowless office that he had to share with another

4

inspector, while every other supervisory inspector in the building, including those junior to Dillon, received spacious, private, windowed offices; (4) Morano reassigned Dillon to the position of Supervisory Inspector of the Elder Abuse Unit, which Dillon claims is the least desirable unit in the OCSA; (5) Morano assigned Dillon the menial and clerical task of organizing the evidence room; (6) Morano excluded Dillon from certain meetings of top staff and administrative personnel that Dillon had previously attended; and (7) Morano failed to promote Dillon to the position of Chief Inspector.

With respect to the Chief Inspector position, Dillon claims that upon learning that two Chief Inspectors were planning to retire, he attempted to find vacancy postings for these positions. Unable to find such postings, he then sent an email to Morano on May 14, 2003, stating that he had learned there may be a vacancy for a Chief Inspector position, and expressing his interest in applying for that position. Morano responded by email the same day and informed Dillon that no such vacancy existed. On May 22, 2003, Morano issued a memorandum announcing that Lawrence Skinner had been appointed as Chief Inspector for the Division of Criminal Justice. This position was never posted, although Dillon states that virtually all State positions, even those that are appointed, are routinely posted. Skinner has extensive experience in law enforcement, but he has never worked for the OCSA.

On February 10, 2004, Dillon filed this lawsuit against Morano in the United States District Court for the District of Connecticut. Dillon alleged that Morano's interference with Dillon's performance evaluation, imposition of degrading work conditions and failure to promote him constituted adverse employment decisions taken by Morano in retaliation for Dillon's lawsuit against Bailey. Morano moved for summary judgment on the following grounds: (1)

5

Morano's actions were protected by legislative immunity; (2) Dillon had failed to make a prima facia case of retaliation; and (3) Morano would have taken the same actions against Dillon regardless of his speech activity. The district court first rejected Morano's claim of immunity.[1] The district court then found that Morano's interference with Dillon's performance review, cramped office, transfer to the Elder Abuse Unit, assignment of organizing the evidence room, and exclusion from certain meetings did not constitute adverse employment actions. With regard to the reduction of staff and resources for the GCCAB, the district court found that while this could constitute an adverse employment action, Dillon had failed to establish a causal connection between this decision and Dillon's protected speech activity. Finally, with regard to the failure to promote claim, the district court found that Dillon had made a prima facie case of retaliation, but Morano had met his burden of establishing that he would have hired Skinner even absent Dillon's protected speech activity. Accordingly, the district court granted summary judgment in favor of Morano and dismissed the case in its entirety. Dillon filed a timely notice of appeal.

## DISCUSSION

We review de novo the district court's grant of summary judgment, viewing the record in the light most favorable to the non-moving party. Treglia v. Town of Manlius, 313 F.3d 713, 718 (2d Cir. 2002). "In determining whether a case presents triable issues of fact, we, like the district court, may not make credibility determinations or weigh the evidence, and we must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." Jaegly v. Couch, 439 F.3d 149, 151 (2d Cir. 2006) (internal citations omitted). "Summary judgment is not appropriate where a review of the record reveals sufficient evidence for a rational

---

[1]Morano does not challenge the district court's denial of his immunity defense.

trier of fact to find in the plaintiff's favor." Treglia, 313 F.3d at 719.

In order to survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action. See Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir. 2006). If a plaintiff makes a sufficient showing of each of these elements, summary judgment is not appropriate unless the defendant establishes as a matter of law that he would have taken the same adverse employment action even absent the protected conduct. Id. at 253.

Morano does not dispute that Dillon has engaged in protected activity. Morano instead argues that Dillon has not established the other elements of a prima facie case of retaliation, and even if he has, that Morano has shown that he would have taken the same actions regardless of Dillon's prior protected activity. With the exception of the failure to promote claim, we agree that Dillon has failed to set forth a prima facie case of retaliation, but with regard to the failure to promote claim, we find that Dillon has presented sufficient evidence from which a rational trier of fact could rule in his favor. Accordingly, we vacate and remand the failure to promote claim, and affirm the remainder of the district court's decision.

***Failure to Promote to Chief Inspector***

Dillon has sufficiently set forth a prima facie case of retaliation with regard to the failure to promote claim. Morano does not dispute that denying an employee a promotion is an adverse employment action, and sufficient evidence exists in the record to "warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action."

7

Cotarelo, 460 F.3d at 251 (internal quotation marks omitted). First, the record contains evidence that Morano had openly displayed animus towards Dillon because of Dillon's previous conduct in reporting the FBI wrongdoing and pursuing his lawsuit against Bailey. Dillon states in his affidavit that after his allegations against the FBI agents became public, he and members of his squad were summoned by Bailey and Morano for a meeting. At this meeting, Morano was reportedly very angry that the newspapers had learned of the incident, and he allegedly told Dillon and the other inspectors that they had "stuck it up [his] ass" and that "this will affect the way I treat certain employees in the future. It is too bad it has to be this way - - you betrayed my trust and I won't make that same mistake in the future." Although this statement was made before the Dillon v. Bailey lawsuit, it provides support for Dillon's contention that Morano harbored hostile animus towards him, particularly when viewed in conjunction with the other piece of direct evidence of animus contained in the record. Richard Palombo, who was Dillon's supervisor while he was at the GCCAB, testified at his deposition that some time after the jury returned a verdict in Dillon v. Bailey, he went to Morano to get a routine request from Dillon approved. Palombo testified that Morano's response to this request was: "Why should I do anything for [Dillon] after what he did to [Bailey]." Palombo further testified that Morano then allegedly stated that Dillon had ruined or destroyed Bailey. Palombo also testified that the request he had brought from Dillon for Morano's approval was denied, and Morano told Palombo to falsely convey to Dillon that the reason for the denial was budgetary constraints.

In addition, the record contains circumstantial evidence from which the jury could infer that Morano had passed over Dillon for the Chief Inspector position because of retaliatory animus towards him. For instance, the record suggests that Morano departed from the usual

8

hiring practice when filling the Chief Inspector position. It is undisputed that the vacancy for the Chief Inspector position was never posted. Although Morano contends that non-union positions need not be posted, there is no evidence in the record, other than Morano's statement, that the Chief Inspector position is not posted as a matter of practice. The record, in fact, indicates that other non-union exempt positions, including for example the Chief State's Attorney position, had been posted in the past. Morano was unable to provide any specific example of a position that is not posted as a matter of practice. The record also shows that the Personnel Office and Morano's Deputy Chief State's Attorney had prepared a vacancy posting for the Chief Inspector position until Morano decided no posting was necessary. This departure from the usual hiring practice provides evidentiary support for Dillon's claim that the true reason for Morano's decision was retaliation. See, e.g., Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312-13 (2d Cir. 1997) (university's hiring decision that departed from usual hiring practices probative of claim that alleged neutral reason was pretextual).

The record also indicates that when Dillon inquired about a vacancy in the Chief Inspector position, Morano directly stated to him that there was no Chief Inspector position available. Dillon emailed Morano on May 14, 2003, inquiring whether there was a vacant Chief Inspector position and expressing an interest in applying for that position. He was specifically told by Morano that no such vacancy existed. But Morano also testified that he knew Chief Inspector Best was retiring and he had already spoken to Skinner about filling this position. In addition, emails dated May 8, 2003, establish that Morano's Deputy Chief State's Attorney was in contact with the Personnel Office to prepare a vacancy posting for the Chief Inspector position. Morano further testified that he never contacted Dillon again to let him know there was

9

a vacancy in the Chief Inspector position. A jury could reasonably find from this evidence that Morano deliberately misled Dillon regarding the status of the Chief Inspector position. While Morano provides an explanation for his statements to Dillon and attempts to show that they were in fact true at the time they were made, it is the jury's task to determine whether to credit that explanation.

In addition, Morano's hiring practice with regard to the Chief Inspector position arguably conflicts with the testimony he gave in the Dillon v. Bailey lawsuit when he attempted to provide a legitimate non-retaliatory reason for denying Dillon the position in the Statewide Prosecution Bureau. In the Bailey lawsuit, Morano testified in a deposition that the reason he passed over Dillon was because he felt it was preferable to "promote from within." Morano reiterated this point at trial, testifying that Mr. Coffey was the more desirable candidate for the position because Coffey "had worked in that [unit] for some period of time" and he "felt it was important to promote from within." This was the legitimate non-retaliatory justification presented in the Bailey lawsuit to explain denying the position to Dillon. Yet with regard to the Chief Inspector position, Morano did not "promote from within" but rather hired someone who had never worked in the OCSA. Drawing all inferences in favor of Dillon at this stage of the proceedings, a reasonable jury could conclude that Morano's reasons for denying promotions to Dillon were in reality post-hoc rationalizations to hide the improper motives that actually prompted his decisions. While Morano has offered explanations that would reconcile his actions here with his testimony in the Bailey lawsuit, we cannot find as a matter of law that a jury would be compelled to credit those explanations.

Based on the evidence in the record and drawing all reasonable inferences in favor of

10

Dillon, a jury could conclude that Morano's animus towards Dillon because of Dillon's prior lawsuit against Bailey was a substantial motivating factor in Morano's refusal to promote Dillon to Chief Inspector. The district court, although recognizing that Dillon had set forth a prima facie case of retaliation, nevertheless granted summary judgment in favor of Morano because it found that "Morano has shown by a preponderance of the evidence that he would have hired Skinner even absent Dillon's protected speech." The district court based this conclusion on the fact that Skinner was qualified for the position of Chief Inspector and "Morano states he did not consider any candidates beside Skinner and that their long-standing relationship was an important reason for hiring him." By focusing its analysis on whether the record contained evidence to support Morano's contention that he would have hired Skinner regardless of Dillon's prior protected activity, the district court misconstrued the burden Morano bore at the summary judgment stage. Morano is not entitled to summary judgment because a jury could rule in his favor. Rather, Morano must establish that no reasonable jury, viewing the evidence in the light most favorable to Dillon and drawing all inferences in Dillon's favor, could return a verdict in Dillon's favor. See Capobianco v. City of N. Y., 422 F.3d 47, 54 -55 (2d Cir. 2005) (court of appeals may affirm grant of summary judgment "only if we conclude that on the record presented, considered in the light most favorable to [plaintiff], no reasonable jury could find in his favor"). Here, the only evidence regarding Morano's allegedly legitimate reasons for hiring Skinner over Dillon comes from Morano's own testimony that Skinner was always his only choice for the job, he considered no other candidates for the position, and he chose Skinner because he had known him for many years. A jury is under no obligation to find Morano credible or find this explanation believable. Instead, based on (1) the evidence that Morano had

11

openly displayed animus towards Dillon because of his lawsuit against Bailey; (2) the fact that Morano's conduct in filling the Chief Inspector position appeared to be at odds with the sworn testimony he gave in Dillon v. Bailey regarding his then preference to promote from within; (3) Morano had departed from the customary practice of posting job vacancies; and (4) Morano's affirmative misrepresentation to Dillon regarding the unavailability of the Chief Inspector position, a jury could conclude that Morano's allegedly legitimate reasons for hiring Skinner were pretextual and post-hoc rationalizations for his retaliatory conduct against Dillon. Because the determination of whether Morano would have hired Skinner regardless of Dillon's prior protected activity turns largely on Morano's credibility, we find that a genuine issue of material fact exists precluding summary judgment. See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 157 (2d Cir. 1998) ("To the extent that these inconsistencies can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury."); United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."). Accordingly, we vacate the district court's grant of summary judgment with respect to the failure to promote claim and remand for further proceedings.

***Dillon's Remaining Claims***

With respect to the remaining alleged adverse actions taken by Morano, however, we affirm the district court's grant of summary judgment. We agree with the district court that Morano's refusal to sign Dillon's 1997 performance review, the transfer to the Elder Abuse Unit, the assignment of organizing the evidence room, and Dillon's exclusion from certain meetings did not constitute adverse employment actions. We clarify, however, that the proper legal test in

12

determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnick v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted). Zelnick post-dates the district court's decision in this case, and thus the district court applied the standard announced in our decision in Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636 (2d Cir. 2000), which defined an adverse employment action as a "materially adverse change in the terms and conditions of employment." Id. at 240 (internal quotation marks omitted). As we explained in Zelnick, Galabya, which involved an age discrimination claim, applied a "more demanding" standard than the one this court applies in First Amendment retaliation cases. Zelnick, 464 F.3d at 225. Accordingly, "[b]y focusing on 'material adverse changes' in [plaintiff's] employment, rather than on the effect of [defendant's] actions on the exercise of free speech rights of a 'person of ordinary firmness,'" id. at 227, the district court did not apply the correct standard in evaluating Dillon's allegations of adverse employment actions. Nevertheless, as in Zelnick, "th[is] error is of no consequence," id., because even applying the proper test from Zelnick, we find that the alleged acts do not constitute adverse employment actions.

While we do not foreclose the possibility that the assignment of "menial" tasks may constitute adverse employment action, based on the undisputed facts presented in this case, we cannot conclude that a reasonable jury could find the action alleged here was an adverse employment action. While Dillon was understandably upset with being assigned clerical tasks that he viewed as beneath his position, under the circumstances presented in this case, this incident would not chill "a person of ordinary firmness" from exercising his free speech rights.

13

See Zelnick, 464 F.3d at 226 (noting that alleged retaliatory acts must be "more than de minimis" to constitute adverse employment actions). Furthermore, although we have found that the transfer from an "elite" unit to a "less prestigious" unit could constitute adverse employment action, cf. De la Cruz v. N.Y. City Human Res. Admin. Dep't of Social Servs., 82 F.3d 16, 21 (2d Cir. 1996) (finding in employment discrimination case that transfer from elite division could constitute adverse action), Dillon has presented no evidence aside from his own personal opinion that the Elder Abuse Unit is the "least desirable" unit in the OCSA. Similarly, Dillon also fails to present any evidence indicating that any negative consequences resulted from Morano's "interference" with his performance review or his exclusion from certain meetings. It is undisputed that the review was never changed to include any negative comments, and there is no indication that any adverse action occurred based on Morano's refusal to sign the review. There is similarly nothing in the record to indicate that Dillon was disadvantaged in any way by the alleged exclusion from staff meetings, particularly because Supervisory Inspectors were generally not invited to these meetings. Accordingly, we affirm the grant of summary judgment with respect to Dillon's claim that Morano engaged in retaliatory conduct with regard to assigning Dillon to organize the evidence room, transferring Dillon to the Elder Abuse Unit, interfering with Dillon's 1997 performance review, or excluding Dillon from certain staff meetings.

We also affirm the district court's grant of summary judgment with respect to Dillon's claim that Morano engaged in retaliatory conduct when he reallocated resources from the GCCAB and significantly reduced the personnel in that unit, and, as part of that reallocation, forced Dillon to share a cramped, windowless office. The district court found that while this decision was an adverse employment decision, Dillon had failed to present any evidence that his

14

prior lawsuit was a substantial motivating factor in that action. Dillon does not challenge this aspect of the district court's decision in his brief to this court, and thus we find this issue waived. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Moreover, even if we were to review the merits, we would affirm this aspect of the district court's decision. It is undisputed that the reduction and ultimate disbandment of the GCCAB occurred during an office-wide reorganization during which time several actions were taken affecting a number of employees. Indeed, Dillon's direct supervisor, Richard Palombo, was also required to share a windowless office in the same location. Dillon has not presented evidence that this reallocation of resources was targeted at him, or any other evidence from which one could infer that Morano made these various decisions affecting numerous other people in order to retaliate against Dillon. Thus, Dillon has failed to set forth a prima facie case of retaliation with respect to these alleged adverse actions and summary judgment in favor of Morano on this claim is appropriate.

## CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary judgment with respect to Dillon's failure to promote claim and remand that claim for further proceedings. We affirm the judgment of the district court with regard to Dillon's remaining contentions.

15