**SHELTON POLICE UNION, INC. a/k/a Connecticut Independent Police Union, Local #4 and Michael Lewis, Plaintiffs,**

v.

**Robert A. VOCCOLA, in his individual capacity, and City of Shelton, Defendant.**

**Civil Action No. 3:00CV928(JCH).**

United States District Court, D. Connecticut.

Jan. 2, 2001.

Kathleen Eldergill, Beck & Eldergill, Manchester, CT, for plaintiffs.

Thomas J. Welch, John H. Welch, Jr., Winnick, Vine, Welch, Donnelly & Teodosio, Shelton, CT, for defendants.

HALL, District Judge.

This case concerns a challenge by a police officer and his union to discipline imposed on him by his chief of police on the ground that such action violates his rights under the First Amendment to the U.S. Constitution.

## I. FINDINGS OF FACT

### A. Parties

■ The plaintiff, Shelton Police Union, Inc., a/k/a Connecticut Independent Police Union, Local No. 4 ("the Union"), is and was at all times pertinent to this lawsuit, a labor organization authorized to represent police officers in the City of Shelton in connection with their employment by the City.[1]

The plaintiff, Michael Lewis ("Lewis"), has been a police officer employed by the City of Shelton for twenty years. He has been president of the Union for the past six years. As a police officer, Lewis performs the duties of a patrolman, patrolling areas of town to which he is assigned on a daily basis. Based on seniority, he bids for and generally works the night shift. In the course of his work, he reports to a sergeant who serves in the capacity of shift supervisor. Sergeants report to a lieutenant who, in turn, reports to the Chief, Deputy Chief or a Captain. In his capacity as a police officer, Lewis does not ordinarily interact directly with the Chief of Police, but rather with his own shift supervisor, a sergeant. Sergeants are responsible for the day-by-day supervision and operation of the Police Department.

As Union president, Lewis maintained a website for the purpose of allowing Union members to communicate with one another and exchange information on topics of public interest. The website has also been accessible to the public. In his capacity as a Union representative, Lewis enters into contract negotiations with the city of Shelton on behalf of the Union, represents Union members and acts as a spokesperson for the Union. In the course of his Union work, he has had personal contact with Voccola on a number of occasions.

The defendant, City of Shelton ("City"), is and was at all times relevant to this action a municipality organized under the laws of the state of Connecticut. The defendant, Robert A. Voccola ("Voccola"), is Chief of Police of the City, a job he began in March 1999. Prior to becoming Chief of Police, Voccola had extensive experience in law enforcement. Voccola worked for the Town of Stratford in the Police Department for a period of 31 years. He retired from that department with the rank of Captain, a rank he held for 10 years.

---

1. The Union is suing on behalf of its members. An association or organization can sue based on injuries to itself or based on injuries to its members. *United Food and Commercial Workers v. Brown Group,* 517 U.S. 544, 557, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Therefore, whenever the court refers to the rights of the Union, it is referring to the rights of its members, not the Union itself.

As Chief of Police, Voccola is the Chief Executive Officer of the Shelton Police Department and directs its operations. He has the authority to develop and implement internal policies in the Shelton Police Department and to change existing policies without anyone else's approval. He also has the authority to authorize and direct that internal investigations be conducted. He has the discretion to decide whether a particular violation of the rules should result in an internal investigation. He also has the authority to initiate discipline and to recommend whether employees be hired or fired. At all times mentioned herein, Voccola was acting under the authority of the City in his relationship with Lewis.

Presently, Voccola and Lewis exhibit no open hostility toward each other when they speak—they generally smile at each other. In addition, when acting as Union president, Lewis's contacts with Voccola have been and continue to be professional.

At all times mentioned herein, both defendants were acting under color of law.

### B. *Letter of Reprimand*

The dispute between these parties arises from a letter of reprimand and suspension ("letter of reprimand") issued by Voccola to Lewis on April 26, 2000. The reprimand and suspension were based on statements Lewis made to the press and on the Union's website concerning Voccola and the police department. Ex. 2.[2] The letter stated that, by his words and conduct, Lewis had violated "departmental rules and common sense standards." *Id.* at 2.

The letter of reprimand cites five departmental rules that Voccola claims Lewis violated. First, the letter of reprimand

states that Lewis violated Rule J–2 regarding the conduct of internal investigations. Rule J–2 states:

> Members and employees of the department shall treat as confidential any pending investigation of the department or any material or information exempt from public disclosure pursuant to the Freedom of Information Act of the Connecticut General Statutes. Such information shall not be disclosed to anyone except one who is officially entitled to receive it or as directed by a designated superior officer or under due process of law.

*Id.*[3]

Second, the letter of reprimand states that Lewis violated Rule J–4 regarding the release of information to the press. Rule J–4 states:

> To avoid confusion and conflict in the release of information, all formal releases to the press are to be disseminated through the media relations' officer assigned by the Chief of Police or in the absence of such media relations' officer by the commanding officer. No member of the department shall release any information relating to pending investigations or any information not otherwise available to the public if such information is exempt from public disclosure pursuant to the Freedom of Information Act.

*Id.*

Third, the letter of reprimand asserts that Lewis violated Rule J–10 which states: "Members of the department shall be truthful in all written and oral statements." *Id.* at 3. Fourth, the letter of

---

**2.** Plaintiffs' exhibits were marked beginning at "1" and defendants' exhibits were marked beginning at "500."

**3.** The letter also references General Order RE: Conduct of Internal Investigations, Section IV E, which states:

> *Confidentiality of Investigations*
> 1. The progress of Internal Affairs investigations and all supporting materials are considered confidential information.

> This confidentiality serves the need to protect both the employee accused and the complainant.
> 2. The Chief of Police or the Second–In–Command, if authorized by the Chief of Police, are the only persons empowered to release for public consumption the details of an internal investigation.

*Id.* at 2.

reprimand asserts that Lewis violated Rule I–5 which states: "Any member of the department feeling aggrieved at the treatment or orders of a superior shall follow the appropriate procedure of the Shelton Police Department." *Id.* at 4. Finally, the letter of reprimand asserts that Lewis violated Rule J–8 which states: "Members and employees shall not engage in conduct, which impairs the operation of the department or interferes with its efficiency and/or the ability of supervisors to maintain discipline." *Id.* at 4.

The letter of reprimand refers to several specific incidents on which it rested its findings of violations. *See* Ex. 2. The court will explore each of these in detail.

### C. *Meeting With Sergeant Youd*

In the letter of reprimand, Lewis was cited under Rule I–5 and Rule J–8 for statements made about a conversation that took place between Voccola and Sergeant John Youd. After becoming Chief, Voccola set up meetings for the stated purpose of getting to know the members of his Department and hearing what they had to say about it. These meetings were supposed to provide an opportunity for the members of the Department to speak freely to Voccola about their opinions and concerns.

Prior to July 1, 1999, Voccola had held such a meeting with an officer, Chris Woodin. After the meeting, Voccola removed Woodin from duty, allegedly based on his comments and demeanor during the meeting.[4]

On July 1, 1999, Voccola directed a sergeant, John Youd, to come into his office for such a one-on-one meeting. Just prior to his meeting with Voccola, Sgt. Youd spoke to Lewis due to his concern about attending a one-on-one meeting with Voccola. Sometime prior to July 1, Sgt. Youd had learned that Voccola had previously met with Officer Woodin, and that Voccola had removed Woodin from duty supposedly because of something he said during the meeting. In order to protect himself, Sgt. Youd asked to borrow Lewis's tape recorder to record the meeting.[5] Lewis lent Sgt. Youd his tape recorder which Youd concealed and used to make a recording of the conversation during his meeting with Voccola. At the time this recording was made, there was no department policy which prohibited surreptitious tape recording of meetings.

When the meeting was over, Sgt. Youd returned the recorder to Lewis and informed him that Voccola had made racist remarks during their meeting. Lewis listened to the recording and immediately asked Sgt. Youd whether he would agree to allow the Union to release the recording. Sgt. Youd refused to allow release of the recording. He was concerned that Voccola would retaliate against him if he knew Youd had recorded the conversation.

In October or November 1999, with Sgt. Youd's permission, one or more copies of the tape recording[6] of the July 1, 1999 conversation ("the Tape") were provided to Sgt. Charlotte DiCicco, who had litigation either planned or pending against the City. In December 1999, Sgt. Youd authorized the Union to release a copy of the tape for use in a Union proceeding regarding a municipal prohibitive practice complaint involving Officer Woodin. On December 3, 1999, Lewis provided a copy to Katherine Thompson, the town's attorney. She turned it over to Voccola, who took it home and listened to it.

---

**4.** According to Captain Joel Hurliman, Woodin had exhibited similar behavior on two prior occasions in late 1997 and in 1998, but had continued to work without consequence.

**5.** The tape recorder was a digital recorder that records on a microchip. The recorded information can be played from the microchip immediately after it is recorded but it cannot be stored on the microchip because it will be erased the next time the recorder is used. To store the information, it must be transferred to a tape.

**6.** Lewis made tapes by recording tapes from the microchip.

Several days later, in early December 1999, Voccola told Lewis that his voice was not on the tape. Voccola also indicated that, by releasing the Tape, Lewis had "crossed the line" and had personally hurt him and members of his family.

Believing that Sgt. Youd had authorized him to do so, Lewis released the Tape to the *New Haven Register* in December 1999. When Sgt. Youd learned of this release, he contacted the newspaper and indicated that he had not given consent for its disclosure, due to his fear of retaliation from Voccola.

On March 14, 2000, Lewis sent a letter to the Mayor complaining about Voccola's conduct based on the comments he had made on the Tape. That letter outlined the statements made by Voccola at his meeting with Sgt. Youd, complained that such racial slurs were offensive and would set the tone for the police department, and that they presented "an extremely serious matter that must be addressed." Ex. 21. The letter also informed the Mayor that a copy of the tape was given to Voccola and town attorney Katherine Thompson in December of 1999. The letter asked that the matter be addressed to the Union's satisfaction in a timely fashion to avoid any unnecessary bad press and indicated that Voccola appeared to be in violation of certain numerated rules and regulations of the police department by virtue of his conduct.

When Lewis sent his March 14 letter to the Mayor, Sgt. Youd had not yet authorized release of the tape recording to the press. After that letter was sent, Sgt. Youd changed his mind and decided to allow release of the tape to the press. After meeting with the executive board of the Union, Sgt. Youd eventually authorized release of the tape to the newspapers. As soon as this permission was given, Lewis released the Tape to the press.

On March 16, 2000, an article appeared in the newspaper, which accurately described the statements of Voccola which had been recorded July 1, 1999: "You see the (expletive) that's going on in Trumbull about (racial) profiling. I count my blessings every day that they're over in Trumbull and not over here because we could be going through the same (expletive) over here. The (expletive) *muliniam* want to be causing problems." Exs. 11 & 22. "*Muliniam*" is a word from an Italian dialect used as a slur against blacks.[7]

Lewis informed the newspaper of the circumstances under which the Tape had been made and said that there was no doubt that it was Voccola's voice on the Tape. He also stated: "As soon as Youd came out of his office, he played it for me. He didn't have any chance to tamper with it." Lewis further stated that Voccola should resign immediately and said: "I hope to discredit this person and what I really feel is it's appropriate that he resign. He can no longer be an effective leader." Ex. 11.

Voccola understood that Lewis, acting as Union president, had released the tape recording to the press. Initially, Voccola denied that the voice on the tape was his. Later, he acknowledged that it was his voice on the tape, and acknowledged that his remarks were inappropriate and offensive. As a result of publicity surrounding release of his remarks, Voccola apologized, was issued a reprimand by the Mayor of Shelton and was required to attend sensitivity training. At the same time that Voccola was being investigated for making his remarks, Voccola wrote to Mayor Lauretti, recommending that both Sgt. Youd and Lewis be fired because of the tape recording. The Mayor refused to agree with this recommendation.

Although Voccola claimed that Lewis threatened him on several occasions after July 1, 1999, referring to the fact that he had a tape of Voccola in his possession and that he was going to use it against Voccola,

7. The word *"muliniam"* derives from *"me-* *lanzana,"* Italian for eggplant.

Voccola never disciplined Lewis for any of those threats.

In the letter of reprimand, Lewis was reprimanded under Rule I–5 for failing to follow the appropriate grievance procedure with regard to Voccola's comments to Officer Youd. The letter of reprimand disciplines Lewis for publicly announcing his outrage at Voccola's remarks to Officer Youd and complaining about them to the mayor rather than following the department's grievance procedures for complaints about treatment or orders of a superior. Lewis was not, however, complaining about treatment or orders given by Voccola, but about offensive comments made by him.

## D. *Website*

In the Letter of Reprimand and Suspension, Lewis was reprimanded under Rule J–8 for statements he made about Voccola's remarks to Sergeant Youd on the Union website. On March 31, 2000, Lewis posted, on the Union website, a statement complaining about the Mayor's response to the remarks. The website posting also stated: "The union will not stop our efforts to expose Voccola for the fraud we believe him to be." Ex. 519. It referred to Voccola as a "Racist Police Chief" and stated: "We wonder why the Mayor wants their flesh [referring to Youd and Lewis] when he should be thanking them for pointing out our chief (who has finally admitted to it) is a racist." *Id.* In later website postings, the Union posted a question asking, under a picture of Ku Klux Klan ("KKK") members: "Who are these Guys? Find out here." Ex. 519. The answer revealed in response was a KKK picture captioned "The Robert Voccola and Mark Lauretti Fan Club" and "Fans of Mayor Mark Lauretti." Ex. 518. The posting complained again about the Mayor's response to Voccola's racist remarks. Ex. 17.

A later website posting complained that Voccola's apology for his remarks was not sincere. It also quoted some of his remarks from the tape including, "[I don't]

want to sound like a racist ... but they all have an attitude ... I'm here [.] what are you going to do about it." Ex. 18. Finally, the posting called again for Voccola's resignation: "It is well past the time that you remove yourself from Shelton's picture and plant your butt at your retirement home in Arizona." *Id.* It was also reported that Lewis said: "I want to see the chief step down. We can't have a racist running this police department." Ex. 517.

The posting of the KKK picture on the Union website drew one e-mail response from a citizen who had seen it, complaining that both Voccola's racist remarks and the KKK posting were "in very poor taste." Ex. 14. In response, Lewis posted a two-page statement on the website that discussed many of the issues facing the police department. Ex. 14.

## E. *Hiring of Voccola, Jr.*

In the letter of reprimand, Lewis was reprimanded under Rule J–10 and Rule J–8 for statements he made about the fact that Voccola hired his son to work for the Shelton Police Department. A study conducted before Voccola became chief recommended the hiring of more police officers. The method for hiring police officers in Shelton is prescribed by a City Ordinance that was adopted on April 9, 1998. Ex. 9. The appointment of police officers is also governed by the Merit System ordinance of the City of Shelton. *Id.* Section 8.1 of the Merit System Ordinance provides that when a vacancy is to be filled, the Administrative Assistant shall certify to the appointing authority, the Chief of Police, the names of the top five persons from the eligible list. The appointing authority shall select an applicant from the certified list pursuant to Section 8.2 of the Merit System.

Under the City's hiring process, the eligibility list is established through a testing process administered by the Municipal Fire and Police Registry ("Registry"). The testing process consists of both oral

and written tests. First, applicants must demonstrate they have achieved a minimum aptitude profile score on the written Registry test. The minimum aptitude profile score is set by the City's Administrative Assistant in consultation with Police Department management and the Registry. If a candidate scores at or above the established passing score, he or she proceeds to take an oral examination. That score is then added to the aptitude profile score. Additional points are then added to the candidate's score for military service, higher education, law enforcement experience, foreign language abilities, and knowledge of the local area. Candidates are then ranked on the certified list that is given to the Chief of Police. Appointments from this list are conditional on the applicant successfully completing a background investigation, polygraph examination, psychological examination, fingerprint check, fitness examination, and physical and controlled substance examination.

When Voccola arrived as Chief in March 1999, there had been testing and a process which had resulted in an eligibility list for police officer vacancies in Shelton. As of May 5, 1999, Voccola had authorization from the Mayor to hire eight new recruits. The first thing Voccola did was to ask the Personnel Department for a copy of the eligibility list, a list which expired in September 1999. Although once he became chief, Voccola had suggested to his son, Robert Voccola, Jr. ("Voccola, Jr."), that he apply for a position in the Shelton Police Department, Robert Voccola, Jr.'s name was not on the eligibility list that Voccola received in May 1999. Upon receiving that list, Voccola could have then hired directly from it or, if necessary to fill all the openings, extended its expiration date. Instead, in June 1999 Voccola initiated a new testing process which resulted in a new eligibility list that included his son's name.

Christopher Flynn ("Flynn") had already been identified from the previous eligibility list to fill one of the available vacancies. Flynn has worked at the Ansonia Police Department for about ten and a half years as a patrolman and applied for a position as a police officer in Shelton. He had taken written tests administered by the Municipal Fire & Police Registry and in May 1999 underwent a psychological evaluation, agility test, background check and polygraph examination. He also participated in an oral interview with Voccola and others. After all of the testing was complete, Flynn was informed by Lt. Arsenault that he would be hired as a police officer and should be receiving something in writing to confirm it. On July 1, 1999, Voccola also informed Sgt. Youd that Flynn would be hired.

When he did not receive anything in writing, Flynn called Lt. Arsenault and was told that Voccola had "changed his mind" and that it did not look like Flynn was going to get hired. In response, Flynn made an appointment to meet with Voccola.

Flynn met with Voccola and Captain Hurliman. At that meeting, Flynn told Voccola that he wanted to know where he stood and asked Voccola whether anything had "popped up" during the process which had raised a problem. Voccola indicated that nothing had come up, and he should just be patient, mentioning budget restraints or fiscal responsibilities. Flynn was informed that he was still in the running. Flynn never was hired.

Voccola testified that, although he conditionally hired Flynn, he ultimately decided not to hire him because his psychological, background and polygraph tests showed "despicable acts" that he would not consider proper for a police officer.[8] According to Voccola, these "despicable acts" included a history of fixing tickets for friends, a history of civil rights violations of persons

---

8. Although Voccola also claimed that he had expressly told this to Flynn when he came in to see him to ask why he had not been hired, the court accepts Flynn's testimony that he was never told this information.

who claimed he had used excessive force, a history of motor vehicle accidents with police cars, one of which was intentional, and an admission of stealing from the Ansonia Police Department.

Voccola admitted, though, that it is common for citizens to make complaints against police officers which are unfounded, and that he did not know whether or not the complaints against Flynn were well founded. In terms of the claim that Flynn fixed tickets, Voccola testified, "I didn't delve into it." There is no evidence before this court that any of these claims resulted in disciplinary action of any kind by his department, with the exception of a written warning concerning a dent in a police car.

Flynn was never given the opportunity to discuss with Voccola the results of his background investigation or polygraph examination.[9] Had he been able to do so, he would have explained the information reported on the polygraph. He would have explained that the "forgery" reported on his polygraph consisted of his signing his wife's name to her paychecks, with her permission, prior to depositing them in their joint account. He would have explained that "fixing tickets" meant calling up a prosecutor and indicating that a friend had received a ticket. As for "stealing" from his employer, he would have explained that this consisted of making personal copies of leave requests on the Police Department copier every once and a while and also, when employed in the late 1980's in a restaurant, of eating "mistakes" made by the kitchen, which could not be sold. He also would have explained that the claims for civil rights violations had not resulted in the institution of internal investigations and that none had involved an admission of liability on his part. The court finds none of these to be "despicable acts."

In June 1999, three months before the existing eligibility list expired, Voccola took steps to initiate a new hiring and selection process. Voccola, Jr. applied for a position as a police officer at this time and scored an 85 on the Municipal Fire and Police Registry test. The passing score chosen for the new test was 82, four points lower than that in the existing eligibility list. The Administrative Assistant did not know that Voccola, Jr. was a candidate when the passing grade was set.

As soon as he learned that Voccola's son was an applicant for the position of police officer in Shelton, Lewis contacted Mayor Lauretti and informed him that he believed that Voccola should play no role in the hiring process, given the fact that his son was an applicant under consideration, and that he should remove himself from the hiring process. The Mayor indicated that he saw no problem with the situation, however.

All of the candidates, including Voccola's son, were subjected to a "Chief's Interview" conducted before a four-person panel comprised of Ken Knappi (Director of Emergency Services), Voccola, Deputy Chief Haurilak and Lt. Arsenault. Both Haurilak and Arsenault report directly to Voccola. Voccola sat in on all the interviews, including the interview of his son. He also sent in a personal reference on behalf of his son, to be considered as part of his application.

Before making any conditional offers of employment to candidates, Voccola reviewed all of the test results of the candidates to date, including those of his son. Voccola informed Mayor Lauretti that he had conducted this review and recommended that Voccola Jr., among others, be given a conditional offer of employment. *See* Ex. 5.

As of the time Voccola made this recommendation, Voccola Jr.'s test results revealed that under the score for "logical reasoning" he had scored below 70, placing him in a category of "needs remediation."

---

9. Pursuant to this Court's order of September 27, 2000, the test report was filed under seal. However, the court modifies that Order in part, in order to make these findings.

In the area of "social judgment," he had been scored as "overly aggressive, could be abrasive (TRAINING NEED)." In the category of personal characteristics/behavioral potential, it had been noted that his "level of personal-social development rated in lowest 25% of public safety applicants." In the category of job performance/problem indicators, his profile indicated that, as to both categories, there existed a large number of areas where "greater than average training attention and effort may be required." Ex. 4.

In Voccola, Jr's "historical profile," it was revealed as to education that: "At interview claimed associate degree from Housatonic Community Technical College ('HCTC') in 1999. However transcript reveals no degree—rather that he was placed on academic suspension at end of spring 1999 semester." A notation stated: "further investigation is suggested." Other questions about Voccola, Jr.'s background were also raised in the application. It was noted that at his interview Voccola, Jr. had denied any motor vehicle violations. However, his DMV history indicated a failure to appear on license suspensions in 1994–95. The "historical profile" also raised questions about his marijuana and alcohol use. Ex. 4. Despite all of this information, Voccola recommended his son as one of four people to be given a conditional offer of employment.

After this conditional offer of employment was made, a background investigation and polygraph was conducted.[10] Voccola, Jr.'s background investigation indicated that he had used marijuana 15–20 times and had been employed by the Town of Stratford Board of Education where his attendance was not good and his use of sick time unsatisfactory. Voccola, Jr.'s polygraph examination confirmed some recent drug and alcohol abuse.[11]

As to Voccola, Jr's educational background, Ed Sylvia, registrar of HCTC, was interviewed. He indicated that Voccola's son was one class short of receiving his associate's degree in criminal justice, and that he had spoken to Voccola, Jr. about this course in November 1999. Although Voccola, Jr. had taken this course at another university, Sylvia found that the credit Voccola, Jr. received for the class did not meet the passing standard as set by HCTC. Sylvia had recommended to Voccola, Jr. that he re-take the course at HCTC. Ex. 6a at 13a.

Under the City's hiring process, one of the components of a candidate's score takes into account his educational background. Ex. 9. Someone with an associate's degree gets three points added to their score. Voccola Jr. had three points added to his score, which moved him above five other candidates he otherwise would have scored below. Ex. 9. Although the City became aware of Voccola, Jr.'s lack of an associate's degree when the background investigation report was submitted in December 1999, he was nonetheless given three points for this degree. Exs. 6, 9. With the three points for an associates degree, Voccola, Jr. was ranked fourth on the eligibility list. Without the three points, he would have been tied with two other candidates for ninth place on the list.

After the polygraph and background investigation of Voccola, Jr. had been con-

10. Although Lt. Arsenault had in the past handled polygraph and agility portions of the police officer test for the City of Shelton Police Department, he did not handle these matters at the time that Voccola, Jr. was hired. Rather, Captain Hurliman did.

11. The court ordered Voccola, Jr.'s polygraph sealed and directed defendant's counsel to notify him that it had been introduced into evidence under seal, but that the seal may be lifted by the court. He was to be further advised to notify the court of any objection. Defendant's counsel reported on October 6, 2000 that he had complied with the court's Order. To date, no objection has been received from Voccola, Jr.. Because the court relies in part on the contents of this report in reaching its decision in this case, it modifies its prior sealing order to the extent necessary to support its findings.

ducted, Voccola signed an acknowledgment indicating that all the requirements for the position had been met, and all of the tests and examinations had been completed. Ex. 7. Voccola was aware that a polygraph had been conducted on January 21, 2000, and that a background check had been completed but he did not review either report despite having done so with other applicants. On January 27, 2000, Voccola recommended his son be hired. Voccola, Jr. was then hired.

Gary Komoroski ("Komoroski") was the number one ranked candidate, out of 46 candidates, on the eligibility list which contained Voccola, Jr's name, but Komoroski was not hired. Komoroski had responded to an advertisement issued by the City seeking police officers some time prior to October 15, 1999. He applied for the job through the Municipal Police & Fire Registry. He took the cognitive (written) test, and received a score of 88, then took the psychohistorical portion of the test and was informed that he had passed. He took the oral examination and received a score of 100%. He took and passed an agility test. After all of those tests had been included, Komoroski attended the Chief's interview.

At the time of his interview in 1999, Komoroski had more than twenty years of experience at the Hamden Police Department, including supervisory experience and held the rank of Sergeant. He had received 19 commendations, 8 letters of recognition and 2 unit citations during that time.

At his interview, Komoroski explained why he was interested in leaving a Sergeant's position in Hamden to take a lower-paying police officer position in Shelton. The Shelton job would allow him to work in Shelton, where he lived, and to be close to his young daughter, who had a seizure disorder. He would have been able to work the night shift so that he could be with his daughter during the day. While earning patrolman's pay in Shelton, he would be collecting retirement benefits, including full medical benefits, from his prior job in Hamden.

Voccola testified that Komoroski was not hired because he made it clear to the panel at the Chief's interview that he intended to work for the Shelton Police Department only in an interim capacity, for six months, while he waited for a position in the State's Attorney's Office for which he had applied. However, Voccola admitted that at the time of his interview, Komoroski told Voccolla and the other panel members that he had no pending application with the State's Attorneys' Office. The court accepts Komoroski's testimony that he did not tell the interview panel he was waiting to be hired by the State's Attorney's Office. He did tell them that he had previously applied for work there, had not been hired and that he had no other applications pending with that office. Komoroski never told anyone at the City that he was only interested in working for Shelton on a temporary basis.

In May or June 2000, some six months after his interview and four months after being informed that all of the positions had been filled by other candidates, Komoroski received a call from Deputy Chief Haurilak informing him that they were updating the eligibility list and asking whether he was still interested in the position. Komoroski told him that he definitely was. He never heard back from the Shelton Police Department.

Based on the above, the process under which Voccola, Jr. was hired was tainted. Voccola, Jr. was hired despite poor performance on several of the tests and a background that included drug and alcohol abuse, questionable employment practices, and motor vehicle violations that he previously denied. "Criteria" used to reject another, qualified candidate were ignored in "evaluating" Voccola, Jr. He was given credit for a degree that he had not received. He was hired in lieu of other, more qualified candidates. Finally, unlike other candidates' reports, Voccola, Jr.'s

polygraph and background check were not reviewed by Voccola.

Voccola, Jr. resigned from the Shelton Police Department on April 7, 2000, citing the comments being made by Lewis about him. Lewis's comments in the newspaper included: "The Chief manipulated the hiring process to make room for his son . . . the playing field wasn't level." Lewis also posted a letter to the editor of the *Huntington Herald* which appeared on the Union website. Ex. 13 Included in that letter was the statement: "The testing process was obviously tainted." *Id.*

Lewis stated on the Union website on April 12, 2000: "Chief Voccola reports in the press that he wants to bring ethics to the Shelton Police Department. This is the same guy who manipulated the hiring process to get his son a job. The same guy who knew his son did not have an associate's degree but allowed his son to get three preference points. Here is a guy who lies with the ease of a snake oil salesman." Ex. 20. In another website posting, Lewis called for Voccola's resignation: "For the good of the City and the good of the Department, Chief Voccola, submit your resignation." Ex. 19. Lewis also stated to the press: "This won't be over until he [the chief] resigns." Ex. 516.

### F. *Internal Investigations*

In the letter of reprimand, Lewis was cited under Rule J–2 and Rule J–4 for allegedly providing information to the public about confidential internal investigations. In March 2000, Lewis learned that another police officer, Dave Eldridge, had filed a criminal complaint against Voccola, based on threatening actions Voccola had taken against him. When a citizen files a criminal complaint with the Shelton Police Department, the fact that someone has filed a complaint is not ordinarily kept confidential. The fact that someone filed a complaint and the nature of the complaint is ordinarily listed in the police blotter. Ex. 530. The blotter does not identify the target of the complaint.

A citizen who files a complaint has a right to speak publicly about his or her complaint, or about the fact that his or her complaint has been filed. All of the information obtained by Lewis about the Eldridge complaint came directly from Eldridge, rather than from any confidential sources within the Department. While the state prosecutor in Derby conducted a criminal investigation concerning the complaint, no internal investigation concerning the Eldridge complaint was ever instituted by the Department.

On March 14, 2000, in his capacity as Union president, Lewis issued a press release concerning the Eldridge complaint against Voccola. All of the information contained in the press release was relayed to Lewis by Officer Eldridge. Lewis also told a newspaper reporter that the Union wanted Eldridge's charge against Voccola to be investigated by the State's Attorney's Office.

In March of 2000, one officer, Officer George Rodrigues, brought a complaint against another officer, Dave Lawrence. The incident report filed by Officer Rodrigues was provided to *Huntington Herald* Editor Darrin McCann by an undisclosed source. The court does not find that Lewis was the source. Despite this unauthorized disclosure, no internal investigation to discover its source was ever conducted.

Lewis learned about this matter from both Officer Rodrigues and Officer Lawrence, in his capacity as Union president. Because the matter involved a complaint by one union member against another union member, Lewis served as a mediator. Officer Rodrigues later told Lewis that he had dropped his complaint against Lawrence. Officer Rodrigues was upset over the matter and was looking for a way to end it.

Under Shelton Police Department policy, when a complainant decides he wants to drop a complaint, he files a withdrawal of complaint. Once a withdrawal is filed, the Shelton Police Department takes no

further action to investigate the claim. Officer Rodrigues filed such a withdrawal.

Sometime in March, Lewis was contacted by the editor of the *Huntington Herald* and was asked to comment on the pending complaint brought by Rodrigues against Lawrence. Lewis told him that Rodrigues had dropped the charges. At the time Lewis spoke to the editor, he was not aware of any ongoing internal investigation of the Rodrigues complaint which was being conducted. As Union president this is something of which he would ordinarily made aware. Lewis was also unaware of any pending criminal investigation being conducted on the Rodrigues complaint when he spoke.

On March 19, 2000, Voccola, Jr. became the subject of an incident report filed by the Stratford Police Department. According to the report, the Stratford Police had been called to a diner because Voccola, Jr. was causing a disturbance. He was verbally abusive to the customers inside the diner and told them that he was "a cop and couldn't get in any trouble." A diner employee asked that the incident be documented.

Someone at the Stratford Police Department gave a copy of that incident report to Shelton police officer, Dave Murad. Murad picked it up when he was off duty. The incident report was public information. Officer Murad gave the incident report to Lewis, who made it available to the press.

An internal investigation of Voccola, Jr. was begun shortly after the incident occurred. Hurliman was assigned to conduct the investigation by Voccola. During the course of the investigation, he provided Voccola with weekly updates as to his progress. Hurliman interviewed witnesses, took statements and prepared a report with findings in it. It was inconclusive as to whether any rules, regulations or general orders had been violated. However, he did not forward his findings to Voccola, allegedly because he was waiting for two unidentified witnesses to come forward to speak to him about the incident. The Voccola, Jr. internal investigation has been kept open in accordance with the Department's policy of intentionally keeping such investigations open past the statute of limitations for any underlying crime which might be implicated by the incident, in this case, a one-year statute of limitations for misdemeanors. Lewis played no part in conducting the internal investigation of Voccola, Jr. and had no access to any confidential police department information about that investigation.

On March 27, 2000, Lewis spoke to Joe Miksch of the *New Haven Register* who called him concerning the existence of an ongoing internal investigation of Officer Voccola due to the diner incident. Miksch had learned of it from someone other than Lewis. Lewis confirmed the existence of an internal investigation and stated that it had been assigned to Captain Hurliman. Lewis also expressed a concern that the investigation would not go anywhere because the person being investigated was Voccola's son. Lewis did not provide Miksch with any documents concerning the file or any other information about the investigation. Lewis's statement to the press about the Voccola, Jr. internal investigation did not compromise that investigation.

### G. *Other Statements Made By Lewis*

In the letter of reprimand, Lewis was cited under Rule J–10 and Rule J–8 for additional comments he made about the Shelton Police Department, Chief Voccola, and the City of Shelton.

#### 1. Vote of No Confidence

In March 2000, Lewis was questioned by a newspaper reporter concerning a vote of no confidence in Voccola that had been taken by officers of the Shelton Police Department. He was asked whether such a vote of no confidence had ever been taken before. He responded: "To the best of my knowledge, there hasn't been any

since I've been [there], and I've been [there] almost twenty years." The newspaper reported that Lewis said that "a vote of no confidence [in the chief] hasn't been conducted in more than 20 years in Shelton." Ex. 531. The court accepts Lewis's testimony that he was misquoted. Lewis made the statement about the vote of no confidence based on his memory and experience with the department. The record does not establish clearly when the last "no confidence" vote was taken, but it was at least eight and possibly nearly 20 years ago. The court does not find that the statement was made knowingly or recklessly. After the vote of no confidence was taken, Lewis publicly called for Voccola's resignation.

### 2. Training

On March 15, 2000, Lewis was interviewed by a newspaper reporter and discussed the fact that, since Mayor Lauretti had been re-elected, there had not been any training. The court accepts Lewis's testimony that, at the time he made this statement, he was referring to non-mandatory training outside of the Department which used to be offered to Shelton police officers if they wanted to take it. When offered, classes would be posted on the Union bulletin board and interested officers would sign up. Formerly, postings for the training were put in the roll call room, but since Mayor Lauretti's re-election, no such notices of training have been posted. Therefore, as far as Lewis knew, the training had ceased after the Mayor's re-election. Thus, his statement was not knowingly or recklessly false at the time it was made.

### 3. Police Department Policies and Procedures

In April 2000, Lewis was questioned by a newspaper reporter concerning a new general order issued by Voccola which prohibited officers from carrying personal recorders. At the time Lewis was questioned about this, he had not yet seen the policy itself, nor was he aware that it had been implemented. In reply Lewis stated: "I will still carry a tape recorder regardless." Since he became aware of the policy, however, Lewis has not carried a tape recorder.

As of April 12, 2000, Lewis concluded that Voccola, Mayor Lauretti, Director of Public Safety Knappi and Alderman Anglace had intentionally misled the public concerning the extent to which the Shelton Police Department had been provided with new equipment. On August 14, 2000, Lewis posted a two-page statement on the website in which, among other things, Lewis complained about the lack of Town funds being spent on the police department during Mayor Mark Lauretti's tenure. He stated: "We've been dealing with old radio equipment, yet Ken Knappi reports in the press we have a new state of the art communication system. None exists.... You've read garbage about computers in the cars and computers networked together. None of that exists.... It's very frustrating to hear the bull being put out by the Lauretti, Anglace, Voccola and Knappi's public relations misrepresentations knowing almost everything they say regarding the police and emergency services is a lie." Ex. 14. At the time Lewis made the statement, the department did not have the referenced new equipment. Therefore, Lewis's statement was neither knowingly or recklessly false.

Lewis also stated: "Even Chief Bob Voccola has tape recorded me without my knowledge at the time." Ex. 14. This statement was made in reference to an incident which occurred in Voccola's office in the presence of Captain Hurliman. After the three had begun a discussion on something, Captain Hurliman stated to Voccola: "Why don't you turn that thing off." At that point, Voccola got up from his desk and turned off a recorder that had been on. He turned to Lewis and stated: "I was just trying to make a point." The court accepts Lewis's testimony that he did not know he was being recorded dur-

ing the conversation until Voccola went to shut the recorder off.

## H. *Police Department Morale*

In the letter of reprimand, Lewis was cited under Rule J–8 for several statements and website postings that Voccola alleged "perpetuate[d] turbulence" and undermined Voccola's authority. Ex. 2. However, prior to the time that Voccola came to the Shelton Police Department as Chief, a study of the Police Department had deemed it "dysfunctional" and had concluded that one of the problems with the Department was that its supervisors did not do their jobs.

In addition, prior to Lewis making any of the statements referenced in the letter of reprimand and suspension, events occurring in the police department made it clear that members of the department did not respect Voccola. Voccola's picture, which had been placed on a Union calendar, appeared in urinals throughout the police department in January of 2000.

Voccola admitted that he does not know why the members of the Shelton Police Department did not respect him. According to Voccola, sergeants were reluctant to supervise subordinates and to do their jobs as early as May 1999, long before Lewis made any of his statements cited by Voccola in the letter of reprimand. Voccola gave several examples of sergeants' unwillingness to properly perform their jobs. One of those incidents, according to Voccola, involved Sgt. Youd and another sergeant who were "sleeping on the job". Voccola conceded that he did not know whether or not Lewis's statements caused sergeants to engage in this alleged misconduct. According to Sgt. Youd, there is nothing about Lewis's comments, as described in his reprimand, which have made Sgt. Youd afraid to do his job in the Shelton Police Department or which have made him afraid that he was going to be subjected to criticism by Lewis.

Another incident identified by Voccola as evidence of sergeants' misconduct and interference with Department operations was an incident which resulted in discipline of Sgt. DiCicco. According to Voccola, Sgt. DiCicco had a conversation with the dispatcher in which she said, referring to Voccola: "He can go f__ himself." That incident occurred in the summer of 1999, before Lewis made any of the statements which formed the basis for his discipline.

Voccola cited problems allegedly experienced by Officer Rodrigues as an example of interference with Department operations. However, Voccola conceded that these problems were not caused by any of the statements for which Lewis was disciplined.

Voccola claimed that Lewis's actions in "counseling" members of the Department over the last few months, and as far back as last summer, events which were not a basis of the reprimand and suspension issued to Lewis, have disrupted the Shelton Police Department. Voccola testified that this "counseling" was evidence of Lewis's "anti-administration activities." Counseling Union members is part of Lewis's job as Union president.

Based on the above, the court finds that, while it may be true that the morale in the Shelton Police Department was low, no interference with department operations resulted from or can be attributed to the statements described in Lewis's letter of reprimand and suspension.

## I. *Effect of Reprimand*

Lewis has already served the five day suspension called for in his discipline. The reprimand remains in his file. Although Lewis has utilized the grievance procedure to challenge the reprimand and suspension, an arbitration on the matter has not yet been held. He is utilizing the grievance procedure, but the case is still pending at the State Labor Board. Generally, cases take about a year and a half to be heard and another three to six months to be decided after hearing. A Municipal Prohibited Practice Complaint is also

pending, but has been suspended for a six-month period by agreement of the parties.

Since receiving his letter of suspension and reprimand, Lewis has stopped responding to calls from the press. Since receiving his reprimand and suspension, Lewis has placed little criticism on the Union website. Lewis has generally refrained from speaking out since the reprimand because of the threat that he would be terminated if he continued. Lewis's speech has thus been chilled because of the letter of reprimand.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

This court has original federal question jurisdiction in this matter under 28 U.S.C. § 1331 because it is a civil action arising under the Constitution.

### B. Claims and Relief Sought

Lewis and the Union brought this action to redress rights secured under 42 U.S.C. § 1983 and 1988 and the First and Fourteenth Amendments to the United States Constitution. Lewis and the Union claim that the rules cited in the letter of reprimand against Lewis are unconstitutional either on their face or as applied to him in this case. First, they claim that Rule J–4 violates the First Amendment as a prior restraint of Lewis's First Amendment right to expression because it is overbroad or void for vagueness. Second, Lewis and the Union claim that the rules cited in the letter of reprimand were unconstitutionally applied to Lewis because defendant Voccola, acting pursuant to city policy, disciplined Lewis for speaking on matters of public concern and for his Union activity.

Lewis and the Union seek a declaratory judgment that the prior restraint of Lewis's free speech and retaliation due to his speech by Voccola and the City violates the First Amendment of the U.S. Constitu-

tion. In addition, Lewis and the Union seek a permanent injunction enjoining Voccola and the City from using the City of Shelton Department of Police Services rules, regulations or policies so as to deny Lewis, the Union, or its members their right to free expression and from imposing or threatening to impose discipline in response to the exercise of such expression.[12]

▆ To obtain permanent injunctive relief, Lewis and the Union must demonstrate, first, the absence of an adequate remedy at law and, second, the threat of irreparable injury if the relief is not granted. *See New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989). These requirements are satisfied if Lewis and the Union can demonstrate that they are likely to be deprived of constitutional rights in the future by the acts they seek to have enjoined. *See Local 32B–32J Service Employees Int'l Union, AFL—CIO v. Port Authority of New York and New Jersey*, 3 F.Supp.2d 413, 418–19 (S.D.N.Y.1998). Any loss of First Amendment freedoms for even minimal amounts of time "unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), because there is "no means to make up for the irretrievable loss of that which would have been expressed." *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir.1974); *see also Latino Officers Assn. v. City of New York*, 196 F.3d 458, 462 (2d Cir.1999). Thus, whether Lewis and the Union have satisfied the requirements for injunctive relief turns on whether they have shown that Lewis's reprimand violated his rights under the First Amendment.

### C. Restrictions on Government Employee Speech

▆ It is well established that "[i]ndividuals do not relinquish their First Amendment rights by accepting employ-

12. Lewis and the Union also seek compensatory damages and, against Voccola only, punitive damages. At the agreement of the parties, the issue of damages, if any, has been reserved.

ment with the government." *Harman v. City of New York,* 140 F.3d 111, 117 (2d Cir.1998). Specifically the Supreme Court has found that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). The state, however, does have "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, in evaluating the validity of a restraint on government employee speech, courts must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

■ The balancing of interests that *Pickering* found to be required in government employee First Amendment cases applies both to facial challenges to government employer rules, regulations, or policies and to as-applied First Amendment retaliation claims. *Harman,* 140 F.3d at 118. When a facial challenge to a rule or policy that regulates speech regarding matters of public concern is made, the government must be able to satisfy the balancing test by demonstrating that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) [hereinafter NTEU]. In an as-applied retaliation challenge to a rule or policy that regulates speech regarding matters of public concern, the

plaintiff/employee must first demonstrate that the elements of the retaliation claim are satisfied. *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999). If the plaintiff can establish that the government took adverse employment action because of the employee's speech, then the court balances the interests of the employee and the interests of the government as an employer to determine whether the government's interest is sufficient to warrant the restriction on the employee's speech. *Id.* at 109–10.

### 1. *Facial Challenge*

■ Lewis and the Union argue that the police department's media policy is a prior restraint on speech that is unconstitutional on its face.[13] In order to analyze a facial challenge in the government employee context, the court balances the relevant interests as *Pickering* established. However, *Pickering* applies only when the employee speaks "as a citizen upon matters of public concern," rather than "as an employee upon matters only of personal interest." *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "[P]rivate speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer.... If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its ... action." *NTEU,* 513 U.S. at 466, 115 S.Ct. 1003.

■ Whether an employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 146, 103 S.Ct. 1684; *see also Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Diesel v. Town of Lewisboro,* 232 F.3d 92,

---

**13.** This is the only facial challenge to the police department rules. All other challenges are based on how the rules were applied to Lewis.

107 (2d Cir.2000). "As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." *Morris,* 196 F.3d at 110 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684).

In *NTEU,* the Supreme Court held that a section of the Ethics Reform Act that prohibited receipt of honoraria by government employees violated the First Amendment. *NTEU,* 513 U.S. at 478, 115 S.Ct. 1003. The Court applied *Pickering* in analyzing the constitutionality of the statute because the section at issue regulated speech that involved matters of public concern. *Id.* at 466, 115 S.Ct. 1003. The speech involved matters of public concern because "[t]he speeches and articles for which [the employees] received compensation in the past were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment." *Id.*

Similarly, in *Harman,* the Second Circuit found that challenged policies were "clearly aim[ed] at speech that is of considerable importance to the public" because they "regulate[d] employee speech concerning the policies and practices of two of New York City's largest social service agencies." *Harman,* 140 F.3d at 117–18. The policy at issue in *Harman* stated that "[a]ll contacts with the media regarding any policies or activities of the Agency ... must be referred to the Media Relations Office...." *Id.* at 116. The Second Circuit found that this policy was aimed speech that involved matters of public concern based on the record of the case, which demonstrated the "sort of commentary that [fell] within the purview of the challenged policies." *Id.* at 118. The court found that the plaintiff's statements about the priorities and effectiveness of a child welfare agency were of obvious interest to the public that was served by the agency. *Id.* Because the plaintiff had been disciplined under the statute for those statements, the Second Circuit found that the

statute was aimed at speech on matters of public concern. *Id.*

In this case, Rule J–4 prohibits members of the department from formally releasing information to the press. The rule states that:

all formal releases to the press are to be disseminated through the media relations' officer, assigned by the Chief of Police or in the absence of such media relations' officer by the commanding officer. No member of the department shall release any information relating to pending investigations or any information not otherwise available to the public if such information is exempt from public disclosure pursuant to the Freedom of Information Act.

Ex. 2 at 2. Lewis was disciplined under this rule for statements he made about three different investigations. First, Lewis made statements to the press and posted statements on the Union website about a criminal complaint against Voccola. Second, Lewis disclosed the identity of the investigator in the investigation of Voccola, Jr. Finally, Lewis reported to the press that Officer Rodrigues dropped his complaint against Officer Lawrence.

Just as the public has a concern in the policies and practices of the city child welfare agency, it has a concern in the policies and practices of a city police department and investigations of officers due to those policies and practices. It may be that the public's interest is outweighed by the police department's interest in keeping such information confidential, but as a preliminary matter, investigations of the police chief and other officers are matters of public concern.

Because Rule J–4 is directed at speech that involves matters of public concern, the court must balance the interests of Lewis and the Union in speaking as citizens on matters of public concern with the interest of Voccola and the City in controlling the information released from the police department. Voccola and the

City bear a heavy burden because Rule J–4 restricts expression by a large number of potential speakers. *Harman*, 140 F.3d at 118. Whenever the government enacts a rule which creates a prior restraint on First Amendment expression, giving its officials the power to prohibit speech prior to its utterance, there is a "heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

> The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. *Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.*

*Southeastern Promotions*, 420 U.S. at 559, 95 S.Ct. 1239 (emphasis in original). Despite the presumption against the validity of a prior restraint, the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *NTEU*, 513 U.S. at 465, 115 S.Ct. 1003. Still, a higher burden of justification is required when a policy or rule restrains speech before it occurs. *Id.* Because *ex ante* restrictions on expression "give[ ] rise to far more serious concerns than could any single supervisory decision … [t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468, 115 S.Ct. 1003 (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. 1731). The government "must do more than simply posit the existence of the disease sought to be cured…. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475, 88 S.Ct. 1731.

The concerns about prior restraints on speech are considered when balancing the relevant interests under *Pickering*. See *id.*; *NTEU*, 513 U.S. at 468, 115 S.Ct. 1003. Thus, the government's burden of demonstrating that its interests outweigh the interests of the speakers is greater in cases involving a prior restraint as opposed to cases involving an isolated disciplinary action. *Harman*, 140 F.3d at 118.

Lewis and the Union argue that Rule J–4 is unconstitutional insofar as it restricts the dissemination of non-confidential information by permitting only the Chief of Police or his designee to issue formal releases to the press. In *Harman*, employees of the Administration for Children's Services ("ACS") challenged similar executive orders governing the contacts between the media and employees of the City's social service agencies. *Id.* at 115. Those orders required that communications with the media regarding any policies or activities of the agency be referred to the ACS Media Relations Office, which would then determine the appropriate manner for handling the media contact. *Id.* at 116. Under the *Pickering* balancing test, the Second Circuit found that the interests of the plaintiffs and the public outweighed the interests of the government. *Id.* at 123–24.

> First, …, preclearance requirements pose risks of self-censorship by speakers in order to avoid being denied a license to speak…. Employees who are critical of the agency will naturally hesitate to voice their concerns if they must first ask permission from the very people whose judgments they call into question…. Second, the prior approval mechanism allows the agencies to control the timing of the intended

speech.... In such cases, dissemination delayed may prove tantamount to dissemination denied.... Finally, the regulations raise concerns because they leave the determination of who may speak and who may not ... to the unbridled discretion of a government official.

*Id.* at 120 (internal quotations and citations omitted).

Finding the media policy restrictive of the First Amendment rights of city employees, the Second Circuit considered whether the government's interests outweighed the restriction on those rights. *Id.* at 121. The *Harman* court held that, while the government has a significant interest in protecting statutorily confidential information, it failed to demonstrate that the asserted harms were real and failed to demonstrate that the executive orders were "designed to address the asserted harm in a 'direct and material way.'" *Id.* at 123. Because the policies were not limited to confidential information, they had "the potential to chill substantially more speech than is reasonably necessary to protect the confidential information." *Id.* Thus, under the *Pickering* balancing test, the *Harman* court found the executive orders requiring preclearance before making any statements to the media violated city employees' First Amendment rights.

The *Harman* court contrasted that case to *Weaver v. United States Information Agency,* 87 F.3d 1429 (D.C.Cir.1996). In *Weaver,* the D.C. Circuit upheld a regulation requiring employees of the Agency to submit all teaching, writing, and speaking materials relating to matters of "official concern" to the agency for review before publication. *Weaver,* 87 F.3d at 1431. The court found that, because, under the government's narrowing construction, the regulation only required submission of material for advisement rather than permission to publish, the regulation did not violate the First Amendment rights of the employees. *Id.* at 1439.

Rule J–4 differs from the regulations in both *Harman* and *Weaver.* It prohibits members of the department from making any "formal releases" to the press and from releasing any information relating to pending investigations or information not otherwise available to the public. Unlike the regulation in *Weaver,* the rule does prohibit members of the department from speaking, but it is also not the blanket preclearance rule that was at issue in *Harman* because it contains limiting language.

Balancing the interests at issue in this case, Rule J–4 does not, on its face, violate the First Amendment. As discussed above, the members of the police department have a First Amendment interest in speaking about policies and issues in the department. Rule J–4 restricts that interest. Therefore, Voccola and the City must demonstrate that the City's interests outweigh those interests.

Voccola and the City argue that the rule only prohibits employees from making statements to the press on behalf of the department and from releasing information that is protected by statute or concerns a pending investigation. By limiting the rule to "formal releases" and confidential information, the department has made it clear that officers can speak on matters of public concern that might even involve police policy or other practices, but cannot issue formal press releases on behalf of the department or discuss statutorily-protected confidential information.

The interest of the government in prohibiting the release of such information is substantial. First, with regard to "formal releases," the City has an interest in ensuring that any public statements that are attributed to the police department have been approved by the head of that department. This does not prevent individual officers from speaking about their experiences or beliefs on matters concerning the department; it only prohibits them from purporting to so speak on behalf of the police department. Second, with regard to confidential information, protecting such information is a significant governmental

interest. *Harman,* 140 F.3d at 122. "Not only could disclosure of such information injure the reputation and security of those the agencies serve, but a failure to maintain confidentiality may undermine public confidence in the agency." *Id.* The *Harman* court only considered the regulation's impact on the release of non-confidential information. In this case, the only information restricted is either statutorily protected information or information regarding pending investigations, both of which involve only confidential information.

Further, the government's interest in functioning as effectively as possible has also been found to justify restrictions on employee speech. *See Waters v. Churchill,* 511 U.S. 661, 675, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Connick,* 461 U.S. at 150–53, 103 S.Ct. 1684. In order to function effectively, the police department must have control over statements attributed to it and must be able to protect information about pending investigations so as not to put the investigation or those involved in it at risk. Therefore, in this case, the government's interest in functioning effectively is served by Rule J–4.

The *Harman* court found the regulation at issue in that case to be overbroad in part because it was not designed to address the asserted harm in a direct and material way. *Harman,* 140 F.3d at 123. That regulation required that all communications with the press regarding "any policies or activities" of the agencies be prescreened. *Id.* By only applying to "formal releases" and confidential information, Rule J–4 is much more limited. It directly addresses the government's concern about having statements made by others on its behalf and having confidential information about its investigations released to the press.

The letter of reprimand issued to Lewis itself demonstrates that Rule J–4 is limited. Lewis made several statements to the press for which he was reprimanded. The only statements for which he was found to violate Rule J–4, however, were

those that related to investigations. Whether the rule was appropriately applied will be addressed in the next section. It is instructive, however, that Voccola did not reprimand Lewis under Rule J–4 for statements he made criticizing the Chief or the department. In addition, Lewis did not indicate that he ever felt restricted by Rule J–4 from making such statements to the press. Thus, the rule does not, "silence discourse ... simply because superiors disagree with the content of the employees' speech." *Rankin,* 483 U.S. at 384, 107 S.Ct. 2891. The plain meaning, government interpretation, and employee interpretation of Rule J–4 demonstrate that it was designed to address the government's legitimate concerns in a direct and material way.

In sum, Rule J–4 restricts employees' interests in free speech only in the context of "formal releases" and confidential information. At the same time, the Rule addresses the government's significant interests in keeping statutorily protected information confidential, protecting information about pending investigations, and approving any public statements released on behalf of the police department. Balancing these interests, the court finds that the government has satisfied its burden of demonstrating that its interests in confidentiality and effectiveness outweigh police officers' interests in speaking for the department or releasing confidential information. Therefore, Rule J–4 is not unconstitutional on its face.

### 2. *As–Applied Challenges*

Lewis and the Union claim that all of the rules cited in the letter of reprimand and suspension violate Lewis's First Amendment rights because of the way they were applied in this case. Specifically, Lewis and the Union argue that the letter of reprimand and suspension was given in retaliation for his speech.

The letter of reprimand refers to several statements made by Lewis as the basis for

the reprimand. First, the letter states that Lewis violated Rule J–2 regarding confidentiality and Rule J–4 regarding media relations when he made statements to the press and posted a statement on the Union's website regarding Officer Eldridge's criminal complaint against Voccola and gave the press information about the investigation of Voccola, Jr. and the complaint brought by Officer Rodrigues. Second, the letter states that Lewis violated Rule J–10 regarding truthfulness by making "reckless and inflammatory written and oral public statements without regard for the truth." Ex. 2. Specifically cited were Lewis's statements regarding the hiring process for Voccola, Jr.; a statement that a vote of no confidence in the chief had not occurred in more than 20 years; statements about a lack of training in the department; a statement about Voccola recording Lewis without Lewis's knowledge; and statements accusing the City and Voccola of lying about departmental resources. Third, the letter of reprimand states that Lewis violated Rule I–5 regarding grievance procedures by publicly announcing outrage about the taped conversation between Officer Youd and Voccola rather than filing a complaint within the department about it. Finally, the letter of reprimand states that Lewis violated Rule J–8 regarding interference with the operation of the department by making all of the statements he made to the press and all of the postings he put on the Union website about Voccola.

The *Pickering* balancing test applies to as-applied First Amendment challenges. In a First Amendment retaliation claim, however, before the balancing test is reached a plaintiff must first establish that the elements of the retaliation claim are satisfied. *Morris*, 196 F.3d at 110. "A public employee who seeks to recover on

the ground that he has been disciplined because of the exercise of First Amendment rights must establish, as an initial matter, that his speech may be fairly characterized as constituting speech on a matter of public concern ... and that speech was at least a substantial or motivating factor in the adverse action taken by the employer." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998) (internal quotations and citations omitted). Thus, "[t]o prevail on a First Amendment retaliation claim, a public employee must establish '[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 107 (2d Cir.2000) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994)). If the employee meets these burdens, the government may escape liability in two ways. *Heil*, 147 F.3d at 109. First, the government can prevail if it can show, under the *Pickering* balancing test, "that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities ... and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." *Id.* (internal quotations and citations omitted). Second, the government can avoid liability "if it can show that it would have taken the same adverse action in the absence of the protected speech." *Id.* at 110.

Lewis has established the three elements of a government employee retaliation claim with regard to the letter of reprimand. First, the comments and the postings made by Lewis touched on matters of public concern and were thus protected speech.[14] In order for Lewis's

---

**14.** The court notes that there is little doubt that certain of Lewis's statements would be offensive to some readers or listeners. However, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of

public concern." *Rankin v. McPherson*, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). It is well established that "debate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleas-

speech to be protected in this case, he must have been speaking "as a citizen upon matters of public concern." *Connick,* 461 U.S. at 147, 103 S.Ct. 1684. Just as with a facial challenge, the government does not have to justify every disciplinary action taken in response to an employee's private speech regarding personal matters, but where the employee speaks on matters of public concern, the government bears the burden of justifying any adverse action. *Harman,* 140 F.3d at 117; *see Rankin,* 483 U.S. at 388, 107 S.Ct. 2891. Whether an employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 146, 107 S.Ct. 2891; *see also Rankin,* 483 U.S. at 388, 107 S.Ct. 2891; *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000). "As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684).

The Supreme Court considered how to determine whether speech is connected with matters of public concern in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In *Connick,* the plaintiff was fired in part for distributing a questionnaire to her fellow staff members concerning several inter-office issues. *Connick,* 461 U.S. at 141, 103 S.Ct. 1684. The Supreme Court found that, for the most part, the questionnaire did not touch upon matters of public concern but, instead, pertained to office morale and stemmed from the plaintiff's own personal

dispute in the office.[15] Id. at 148, 103 S.Ct. 1684. The plaintiff "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust.... Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Id.* at 148, 103 S.Ct. 1684. Therefore, the Court concluded, the employee's speech did not involve matters of public concern.

In *Morris v. Lindau,* 196 F.3d 102 (2d Cir.1999), the Second Circuit considered whether statements by members of a police department about law enforcement issues were matters of public concern. The Second Circuit found that "speech on crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern." Id. at 111. In addition, the court found that a police officer's public support of a police chief, complaints about certain ticketing practices, and grievance about the Town filed with the Occupational Safety and Health Administration involved matters of public concern. Id. at 113; see also *Hale v. Mann,* 219 F.3d 61, 71 (2d Cir.2000).

 The speech for which Lewis was disciplined in this case concerned racial comments made by the Chief of Police, conflicts of interest within the police department, and the general operation and management of the police department. Based on the content, form, and context of the statements, the statements clearly in-

antly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**15.** Specifically, the Court found only one question addressed a matter of public concern. That question inquired whether district attorneys "ever feel pressured to work in political campaigns on behalf of office supported

candidates." *Connick,* 461 U.S. at 149, 103 S.Ct. 1684. The Court found, however, that because the First Amendment interest was so limited, the interest of the government in preventing disruption in the office from the undermining of authority and in preserving working relationships outweighed the plaintiff's First Amendment interest.

volved matters of public concern. First, unlike the plaintiff's questionnaire in *Connick*, the statements that Lewis made were addressed to a public audience either through the press or through the Union website. Second, the statements he made were not about a personal problem with the department or Voccola, but concerned departmental policies and practices in hiring and training. *See Harman*, 140 F.3d at 117; *Morris*, 196 F.3d at 111. Third, racist comments by the chief of police that might suggest inappropriate police practices, a change in the amount of training officers receive, and questionable hiring practices that favor a close relative over qualified candidates are of crucial importance to the accountability of the Chief of Police, a local official who the public has an interest in holding accountable. *See Vasbinder v. Ambach*, 926 F.2d 1333, 1340 (2d Cir.1991) (finding that speech concerning the corrupt practices of public employees is speech regarding matters of serious public concern). Finally, many of the statements were made in response to questions by the press. Thus, the issues were being discussed in various public fora by people other than Lewis, suggesting that these were matters for which the public had concern. Because Lewis's statements were not personal, involved departmental practices and policies, were made in the context of community discourse about the issues, and were made to the public, they were matters of public concern. Therefore, Lewis's speech was protected speech, and he satisfies the first element of a retaliation claim.

■ Lewis has also satisfied the second and third elements of a retaliation claim. The letter of reprimand was an adverse employment action. *Morris*, 196 F.3d at 110 ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."). Thus, the second element is satisfied. Further, the letter itself specifically states that the reprimand and suspension were due to what Lewis said to the press and posted on the website, thus satisfying the third element of a First Amendment retaliation claim.

Voccola and the City do not argue that they would have reprimanded Lewis even in the absence of the protected conduct. Instead, they argue that, under *Pickering*'s balance of interests, their interests as an employer outweigh the infringement on free speech in this case.

### a. Disruption of the Department

Voccola and the City argue that the application of Rule J–8 and Rule I–5 to Lewis's statements to the press and postings on the Union website criticizing Voccola and calling for his resignation was not unconstitutional because the statements disrupted the department and interfered with Voccola's ability to maintain discipline. Rule J–8 prohibits conduct that "impairs the operation of the department or interferes with its efficiency and/or the ability of supervisors to maintain discipline." Ex. 2 at 4. Rule I–5 requires "[a]ny member of the department feeling aggrieved at the treatment or orders of a superior" to follow the appropriate procedures. Ex. 2 at 4.

In balancing interests under *Pickering*, "the state interest element of the test focuses on the effective functioning of the public employer's enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Thus, pertinent considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891.

Voccola and the City bear the burden of demonstrating that Lewis's speech threatened to interfere with police department operations. *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998). To justify disciplinary action on this basis, they must demon-

strate that (1) their prediction of disruption was reasonable; (2) the potential disruptiveness outweighs the value of the speech; and (3) they took action against the employee based on this disruption and not in retaliation for the speech. *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir.1995).

 With regard to Rule I–5, Voccola and the City argue that Lewis should have followed the department's grievance procedures if he had a problem with Voccola. The letter of reprimand disciplines Lewis for publicly announcing his outrage at Voccola's remarks to Officer Youd and complaining to the mayor rather than following the grievance procedures for complaints about the treatment or orders of a superior. However, Lewis was not complaining about his treatment or orders, but about offensive comments made by the Chief. Therefore, Lewis's statements did not fall within the purview of Rule I–5 and Voccola and the City cannot establish that applying the rule to the statements Lewis made was necessary for satisfying any interest served by the rule. Further, the reprimand was issued because of the content of the speech, not because of any purported disruption that might have been claimed to flow from it. The rule was thus unconstitutionally applied in this instance to Lewis.

 With regard to Rule J–8, Voccola and the City argue that Lewis's statements to the press and website postings about Voccola were disruptive to the functioning of the department. However, the claim of disruption is purely speculative and; therefore, does not satisfy the Defendants' burden. The only evidence of disruptions in operation existed prior to Lewis's statements and, in some cases, prior to Voccola becoming Chief. The letter of

reprimand makes conclusory allegations that Lewis's speech constituted a "course of conduct to 'perpetuate turbulence'" but neither the letter nor the evidence presented in the case support the conclusion that Lewis's speech caused or perpetuated the "turbulence" at the Shelton Police Department. Purely speculative allegations cannot satisfy the government's burden of proof in demonstrating that its interest outweighs the free speech interest.[16] *See, e.g., Wulf v. City of Wichita*, 883 F.2d 842, 861 (10th Cir.1989); *Tygrett v. Barry*, 627 F.2d 1279, 1281–82 (D.C.Cir.1980). In addition, as with the citation under Rule I–5, the citation under Rule J–8 was issued because of the content of Lewis's speech, not because of any purported disruption that might have been claimed to follow from it.

Voccola and the City also argue that the discipline of Lewis was warranted because his statements disrupted his relationship with Voccola and, as such, undermined Voccola's effectiveness as Chief. "When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message, but also by the manner, time and place in which it is delivered." *Givhan v. Western Line Consolidated School*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *see also Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir.1999). Here, there were no personal confrontations.

Further, in order to determine whether the agency's efficiency is threatened by the speech, the court must consider the immediacy of the relationship between the employee and supervisor. "When the relationship of superior and subordinate 'is of

**16.** Voccola and the City argue that Lewis "counseled" officers and that such counseling constituted "anti-administration" activity that contributed to the disruption in the police department. The letter of reprimand and suspension makes no mention of such "counseling" as a reason for the reprimand. Instead, it refers to the public comments made by Lewis. Therefore, even if Lewis's counseling of union members was disruptive, such counseling is not at issue in this case. *See United States ex rel. Checkman v. Laird*, 469 F.2d 773, 783 (2d Cir.1972) (finding that a court must consider reasons given by employer for discipline and not reasons that may come to light throughout the record).

such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them,' the balance tips against the employee." *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 26 (2d Cir.1979) (quoting *Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. 1731). The *Janusaitis* court distinguished between the "rights of a school teacher who expresses views essentially as a citizen and for whom the target is the institution or proposition rather than the person ... and a fireman who attacks verbally the very persons with whom he must function in the closest coordination." *Id.*

The Chief of Police in Shelton is responsible for hiring decisions and for the overall supervision of the department. However, Voccola does not directly supervise or otherwise work with officers such as Lewis. There are at least two layers of supervisors between Lewis and Voccola. Therefore, other than as Union President, Lewis did not interact with the Chief in performing his everyday duties as a police officer.[17] Despite the layers of supervision between Voccola and Lewis, the success of a police department in protecting the community depends at least in part on the loyalty and harmony among all officers on the force. Because Lewis does not interact with Voccola in his everyday police work, though, the concern about causing disruption is not as high as it is in a fire department in which the response to any fire may require the officer who criticizes a superior to work directly with that superior.

At the same time, as discussed above, the public had a significant interest in receiving the information about Voccola. "The weight afforded each side of the *Pickering* balance also varies with the content of the speech. The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Lewis*, 165 F.3d at 162. The comments for which Lewis was disciplined under Rule J–8 involved the racist remarks made by Voccola to Youd and the questionable hiring of Voccola, Jr. "[W]ithout disclosures by law enforcement insiders ... corruption is most difficult to detect, prove or prevent." *Dillon*, 45 F.Supp.2d at 174. In this case, Lewis was disclosing a conflict of interest in hiring practices and Voccola's attitude toward minorities. Such disclosures are of critical importance to the community.

The court finds that, in this case, Lewis's interest in speaking about matters of public concern combined with the public's interest in receiving information about suspect practices on the police force outweigh the police department's interest in effective functioning. There is no evidence that the speech caused disruption in the department or interfered with the course of daily police work. Voccola and the City have failed to satisfy their burden of establishing that they reasonably believed that the speech would potentially interfere with or disrupt the government's activities. The importance of the free speech right to Lewis combined with the importance of the information to the public outweigh any government interest. Therefore, Rule J–8 and Rule I–5 were unconstitutionally applied to Lewis in this case.

#### b. Confidentiality

■ Voccola and the City argue that the reprimand and suspension under Rule J–2, Rule J–4, and the General Order Regarding Conduct of Internal Investigations did not violate Lewis's First Amendment rights because the information was statutorily protected and the government has a substantial interest in protecting confidential information. A public employer has a substantial interest in preserving the confidentiality of statutorily protected information and information about its internal in-

---

**17.** The court finds that, when acting as Union president, Lewis's contacts with Voccola have been and continue to be professional, on both sides.

vestigations. *Harman,* 140 F.3d at 123. A general rule preventing disclosure of protected information obtained in the course of public employment is appropriate for satisfying that interest.[18]

Rules J–2 and J–4 prohibit the release of any information "exempt from public disclosure pursuant to the Freedom of Information Act ..." and information "relating to pending investigations." Ex. 2 at 2. The Connecticut Freedom of Information Act protects certain "records of law enforcement agencies not otherwise available to the public." *See* Conn.Gen.Stat. § 1–210(b)(3). The General Order Regarding Conduct of Internal Investigations requires that the "progress of Internal Affairs investigations ... [be] considered confidential information" and prohibits anyone except the Chief of Police or the Second–in–Command from releasing "the details of an internal investigation." Ex. 2 at 2.

Lewis was reprimanded for statements he made about certain investigations. First, Officers Lawrence and Rodrigues provided Lewis with the information that Rodrigues dropped the complaint he had filed against Lawrence. In addition, it was not a pending investigation because the complaint had been dropped. Further, a statement that a complaint has been dropped is not a statement about the details of an internal investigation. Thus, the statements Lewis made about Rodrigues's complaint fell outside the purview of the rules under which he was reprimanded. Therefore, the reprimand under Rules J–2 and J–4 and the General Order Regarding conduct of Internal Investigations was unconstitutional as applied to Lewis in this case.

Lewis was also reprimanded for commenting on Officer Eldridge's criminal complaint against Voccola. First, the fact that a criminal complaint has been filed is not confidential information. Conn.Gen. Stat. § 1–210(a). Such a complaint is recorded in the police blotter by the Shelton Police Department Dispatch service. Ex. 530. The blotter is a public record. Therefore, the information is not exempt from public disclosure under the Freedom of Information Act. The "blotter" did not, however, contain the identity of the target of the complaint. Lewis learned about the target of the complaint and the nature of the allegations from Eldridge himself. Therefore, the information was not obtained from a protected record of any kind. In addition, the statement about the Eldridge complaint was never the subject of a pending or internal investigation by the Shelton Police Department. The complaint was filed at the Shelton Police Department but was given to the state's attorney to investigate. Further, no internal investigation was ever conducted.

This information does not fall within the scope of the rules because it was information that was otherwise available to the public. In addition, it was not a pending investigation in the Shelton police department because it had been given to the state's attorney and no internal department investigation was ever conducted. To the extent Lewis revealed the subject of the complaint, which information was not public, Lewis learned of it from the complainant in his capacity as Union president. Because the information was not within the purview of the rules, the reprimand of Lewis for the statements he made regarding the Eldridge complaint was unconstitutional.

█ Finally, Lewis was reprimanded because he verified to a reporter that an internal investigation of Voccola, Jr. was being conducted, and he released the identity of Captain Hurliman as the investigator in the internal investigation. Doing so did relate to a pending investigation by the police department. In addition, the identi-

---

**18.** Lewis and the Union do not challenge Rule J–2 on its face. The court found above that

Rule J–4 is constitutional on its face.

ty of the investigator is a detail about the investigation and is thus protected by the rule. Thus, releasing the information about Voccola, Jr. was a violation of Rules J–2 and J–4. Lewis and the Union argue, however, that, even if the City has an interest in protecting this kind of information, that interest was outweighed here because the details about Voccola, Jr.'s misconduct and the internal investigation were already public at the time the statement was made and the public's strong interest in having such information combined with Lewis's right to free speech outweigh the interests of the government in keeping the investigation confidential. *See, e.g., Hanneman v. Breier,* 528 F.2d 750, 754 (7th Cir.1976).

Under *Pickering,* the interests of Lewis and the Union combined with the interest of the public in having information about the internal investigation of the Chief's son outweigh the interest of the City in keeping some information about ongoing internal investigations confidential. *See Dillon v. Bailey,* 45 F.Supp.2d 167, 174 (D.Conn. 1999). The City does have a significant interest in keeping information about internal investigations confidential. *Harman,* 140 F.3d at 119. That interest can be outweighed, however, by the interest of the speaker and the interest of the public. *See id.* " 'Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.' " *Id.* (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. 2891).

The story about Voccola, Jr. was already public knowledge when Lewis provided the press with information about Captain Hurliman's involvement. Therefore, the interest in protecting Hurliman's involvement is lower than it would be if the department were conducting a completely confidential internal investigation.[19]

In addition, the public has a significant interest in information bearing on the corruption of a public agency. "[W]ithout disclosures by law enforcement insiders . . . corruption is most difficult to detect, prove or prevent." *Dillon,* 45 F.Supp.2d at 174. In this case, the internal investigation of Voccola, Jr. raised further questions about Voccola, Jr.'s performance in the department and his treatment by Voccola. Uncovering such conflicts of interest could only benefit the public's assessment of the results of the investigation. The public's interest in the information was thus significant.

Further, the investigation of Voccola, Jr. has never been completed. As an ongoing investigation, it is fully protected from the public under the Freedom of Information Act and the Department Rules. This not only raises further suspicion about the legitimacy of the investigation, it also means that the only way the public could have access to information about the internal investigation of Voccola, Jr. is through someone like Lewis speaking to the press. *See Dillon,* 45 F.Supp.2d at 174.

Finally, in addition to the public significance of the information, there is no evidence that, by verifying that the investigation was in progress and providing the information that Hurliman was the investigating officer, Lewis jeopardized the investigation in any way. Public pressure to treat Voccola, Jr. the same as any other officer could only improve the already public investigation of him. Further, public awareness of the identity of the investigating officer would be in the public's interest in assessing the investigation.

Balancing the interests at issue, the interests of Lewis and the Union, as well as the public's interest in the information, outweigh the interests of Voccola and the City with regard to the statements revealing the identity of Hurliman as the investigator in the investigation of Voccola, Jr.

---

**19.** The City itself seems to recognize that information otherwise available to the public deserves less protection. In its own rules regarding confidential information it specifi- cally protects only information about pending investigations and information not otherwise available to the public. *See* Ex. 2 (Rule J–2, Rule J–4).

Thus, Rule J–2 was unconstitutionally applied to Lewis with respect to that speech.

### c. .Recklessly False

 Voccola and the City argue that Lewis was disciplined for making several false statements in violation of Rule J–10. According to Voccola and the City, the City's interest in preventing false statements from being made publicly outweighs any potential infringement on First Amendment rights. The *Pickering* court applied the standard set out in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and found that the plaintiff could not be discharged for his public statement, even though it was at least partially false, without proof that the statement was knowingly or recklessly made. *Pickering,* 391 U.S. at 574, 88 S.Ct. 1731.

There is no evidence to suggest that any of Lewis's statements were knowingly or recklessly made. Lewis was cited under Rule J–10 for several statements. Two of the statements concerned the conflict of interest in the hiring of Voccola, Jr. and accused the chief of manipulating the hiring and testing process. Voccola, Jr. was hired despite poor performance on several of the tests and a background that included drug and alcohol abuse, questionable employment practices, and motor vehicle violations that he previously denied. In addition, Voccola, Jr. was given credit for a degree that he had not received. The credit for the degree significantly increased his ranking on the eligibility list. Finally, Voccola, Jr. was hired despite the fact that there were other, more qualified candidates. The court finds that, in light of the circumstances surrounding the hiring of Voccola, Jr., Lewis's statements about the hiring and testing process were not made with knowing or reckless disregard for their falsity. Lewis's statements were indeed quite accurate: Voccola's hiring of his son was tainted.

The other statements for which Lewis was disciplined under Rule J–10 include a statement about the lack of training, a statement about a no contest vote against the Chief of Police, a statement accusing city officials of lying, and a statement accusing Voccola of tape recording Lewis. Lewis did not make any of these statements knowing they were false or recklessly disregarding their falsity.

First, Lewis was reprimanded for stating: "A vote of no confidence [in the chief] hasn't been conducted in more than 20 years in Shelton." Ex. 2. The court accepts Lewis's testimony that he actually told the reporter that: "To the best of my knowledge, there hasn't been any since I've been [there], and I've been [there] almost twenty years." The exact date of any previous vote of no confidence of a Shelton police chief was not established on the record, although it was at least many years ago. However, there is no evidence that Lewis made the statement he made knowing it was false or with reckless disregard for its falsity. His statement was based on his memory and was qualified as such. Therefore, the court does not find that Lewis made the statement knowingly or recklessly.

Second, Lewis stated: "There isn't any training. That stopped as soon as the Mayor got re-elected." Ex. 2. Lewis was referring to voluntary training available to officers. Notification of such training was typically posted in the roll call room when it was available. At the time Lewis made the statement, he had not seen any such postings of available training since the Mayor had been re-elected. Lewis made the statement based on the information available to him as an officer, believing it was true at the time it was made. The only evidence of training available to officers at the time Lewis made the statement was "Roll Call" training. This was department specific training regarding assignments, general orders, and other administrative issues. Lewis did not consider "Roll Call" training to be police training and was referring to training above and beyond "Roll Call" training when he made the statement. There is no evidence to suggest he made the statement about training knowing it was false or recklessly not knowing it was false.

Third, the letter of reprimand asserts that Lewis stated, "Almost everything they [Mayor Lauretti, Alderman John Anglace, Chief Voccola, and Public Safety Director Nappi] say regarding police and emergency services is a lie." The statement was made in the context of a letter written criticizing the funding of the police department. The letter alleged that the City had misrepresented what equipment was available in the department. Again, Lewis made the statement based on his experience, which was that such equipment was not available. There is no evidence that Lewis made the criticism knowing it was false or recklessly disregarding its falsity.

The same website posting included the statement that, "Even Chief Voccola has tape recorded me without my knowledge at the time." This statement was true. Voccola had recorded part of a conversation with Lewis while Captain Hurliman was present. Lewis did not know the conversation was being recorded until after Captain Hurliman asked Voccola to turn the tape recorder off. Therefore, Lewis's statement about being recorded by Voccola was true and was not made with knowing or reckless disregard for its truth.

Voccola and the City have not provided any evidence that Lewis made the statements for which he was reprimanded under Rule J–10 knowing they were false or with reckless disregard for their falsity. Therefore, Lewis's statements fell outside the purview of Rule J–10 and the Rule was thus unconstitutionally applied to Lewis.

### III. *Conclusion*

For the foregoing reasons, the court finds that Rule J–4 regarding media relations is not unconstitutional on its face. The court finds, however, that the Letter of Reprimand and Suspension was given to Lewis in retaliation for his speech and, therefore, that the rules cited in the letter of reprimand were unconstitutionally applied to Lewis in violation of his First Amendment rights.

Lewis and the Union have demonstrated that they will likely be deprived of their First Amendment rights in the future if they do not receive injunctive relief. Further, no adequate remedy at law exists to protect these rights. Therefore, the court finds that Lewis and the Union are entitled to injunctive relief.

It is therefore ORDERED that:

Robert Voccola and the City of Shelton, their officers, agents, employees and all persons in active concert or participation with them are permanently enjoined from utilizing the City of Shelton Department of Police Services rules, regulations, or policies so as to deny Michael Lewis and other members of the Shelton Police Union, Inc. their right to free expression and from imposing or threatening to impose discipline in response to the exercise of such expression. In addition, the Defendants are ordered to immediately rescind their suspension of Michael Lewis.

**SO ORDERED.**